James X. LONG, Plaintiff,

and

Paul X. Duhart et al., Intervening
Plaintiffs,

v.

C. E. HARRIS, Warden, United States
Penitentiary, Leavenworth, Kansas,
Defendant.

Bro. Edward J. X. FORD, Jr., Minister,
Plaintiff,

and

Eddie X. O'Neal et al., Intervening
Plaintiffs,

v.

Norman CARLSON, Director, Bureau of
Prisons, et al., Defendants.

Vincent L. X. PINA, Petitioner,

v.

C. E. HARRIS, Warden, Respondent.

Ronald X. REED, Petitioner,

v.

Assistant Warden PUTMAN and Warden
C. E. Harris, Respondents.

2. See Order of this Court entered August 11, 1971 denying defendant's petition to have Carney delivered by the United

Bobby Joe X. THOMAS, Petitioner,

v.

Associate Warden PUTMAN and Warden
C. E. Harris, Respondents.

UNITED STATES of America ex rel.
James H. MOORE, Petitioner,

v.

Warden C. E. HARRIS, Respondent.

James X. LONG, Plaintiff,

v.

Norman CARLSON, Director, Bureau of
Prisons, et al., Defendants.

James X. LONG, Petitioner,

v.

C. E. HARRIS, Warden, Respondent.

Nos. L–1244, L–1380, L–1402, L–1474,
L–1492, L–1512, L–1550 and
L–1574.

United States District Court,
D. Kansas.

Oct. 6, 1971.

States Marshal from Lewisburg, Pa. to Wilmington, Delaware to testify at petitioner's trial.

Robert E. Davis and Thomas M. Dawson, Leavenworth, Kan., for petitioners-plaintiffs and intervening plaintiffs.

Richard L. Meyer, Asst. U. S. Atty., Topeka, Kan., for respondents-defendants.

## MEMORANDUM, FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

ARTHUR J. STANLEY, Jr., Senior District Judge, Assigned.

These actions were commenced by the various petitioners as petitions for habeas corpus relief, complaints of denial of civil rights and for damages, "Motions to Show Cause," and "Motions for Writ of Mandamus." In each case the basic contention was that the petitioner, an inmate of the United States Penitentiary at Leavenworth, was held in segregated confinement with loss of privileges, without just cause, solely because of his race or religious belief. All claimed subjection to cruel and unusual punishment and violation of constitutional rights by deprivation of due proc-

ess and that the actions of the respondents were arbitrary and capricious. At their request, the complaints of petitioners Ford and Malry have been dismissed. Turner and Dennis have been released from custody on mandatory release. Caver has been released by court order. Slaughter, Sealie and Jones have been transferred to other institutions.

The cases, consolidated for trial and disposition, were tried to the court, the trial consuming four days. The petitioners and intervening petitioners have requested that separate findings of fact and conclusions of law be made as to each of them. Except insofar as the findings and conclusions are applicable generally to all of them, this will be done. The court, having heard the evidence and the matters submitted by parties and counsel, makes the following

## FINDINGS OF FACT:

### General

1. All times and periods of time mentioned in these findings are those material to the issues. All references to the "penitentiary" are to the United States Penitentiary, Leavenworth, Kansas. Reference to "petitioners" includes plaintiffs and intervening plaintiffs.

2. Each of the petitioners was an inmate of the penitentiary. Each is black and claims membership in the Nation of Islam, sometimes known as the Black Muslims, of which Elijah Muhammad is the titular head. For the purposes of these actions only, I find that each petitioner is a member of the Nation of Islam and that the Nation of Islam is a religion.

3. Each of the defendant-respondents was an officer or employee of the United States Bureau of Prisons and, excepting John N. Mitchell, Attorney General, and Norman Carlson, Director of the Bureau, was on duty at the penitentiary.

4. R. I. Moseley was warden of the penitentiary during part of the time under consideration. He was succeeded upon his retirement by C. E. Harris. Pursuant to Rule 25(d) (1), F.R.Civ.P.,

C. E. Harris is substituted as a party-respondent for R. I. Moseley.

5. Approximately 2,200 inmates were confined at the penitentiary. Of these, approximately forty claimed membership in the Nation of Islam.

6. Two separate groups of inmates competed for leadership and control of the Black Muslim population of the penitentiary. One group included Long, Duhart, Pina, Caver, Stokes, Barron, Mayes, Malry, Cargill, Dennis, Chapman and Crable. This group recognized Long as Minister. The other, made up of Ford, O'Neal, Thomas, Slaughter, Sealie, Turner, Jones, Rose, Reed, Moore and others recognized Ford as Minister. Each group sought to impose its will on the other group and on the remaining Black Muslim prisoners. The existence of such infra-structures within the penitentiary, each seeking to exercise control over other inmates, multiplied the problems of administration, endangered the security of the institution and posed a continuing threat to the safety of its officers and of prisoners not submitting to the group's control.

7. It was the policy of the United States Bureau of Prisons and of the warden of the penitentiary to place in segregated confinement inmates determined to be a threat to themselves, to others, or to the safety and security of the institution. All inmates so confined, including the petitioners, were within one or two days after initial confinement notified orally of the charges against them, given an opportunity to answer the charges, and accorded a hearing before a committee known as the adjustment committee, made up of officers of the penitentiary. The case of each inmate in segregated confinement was reviewed by the adjustment committee at least once weekly.

8. Segregated confinement was divided into three phases. Inmates in the first two phases were confined in a building described as the Control Unit and known generally as "CU." Incorrigibles and persistently assaultive in-

mates were confined in maximum security cells on the first floor of "CU." (Phase #1). Those considered less dangerous to themselves and others were confined in single cells on the second floor of "CU." (Phase #2). When, in the judgment of the adjustment committee, an inmate confined in "CU" became less intractable he was transferred to a block of cells in C cellhouse, known as "CCU." (Phase #3). All inmates in segregated confinement were given the same food as other inmates, but were served in their cells rather than in the dining hall. Prisoners in Phase #1 ("CU") were furnished bedding and permitted to have visitors one hour each month. Those in Phrase #2 ("CU") were allowed the same property as the general population and two hours of visiting privileges each month. Prisoners in Phase #3 ("CCU") had three hours of visiting privileges each month. (Prisoners in the general population were allowed four hours of visitation each month).

9. Black Muslim services were provided for two hours each Sunday at the penitentiary chapel. A custodial officer of the penitentiary was present at the chapel during such services. Black Muslim inmates were permitted to listen for thirty minutes each week to radio broadcasts by Elijah Muhammad.

10. In deference to those inmates whose religion forbids the eating of pork, including Black Muslims, menus were published for each meal with all items containing pork marked to so indicate. A Black Culture program administered by a black employee of the penitentiary was initiated by the respondents. All black inmates were encouraged to attend.

11. In a pamphlet entitled, "Your Orientation Brochure—Muhammad's Mosque of Islam" (Petitioners' Exhibit 21), the organization of the Black Muslim movement is described. There are levels of rank, each with prescribed responsibilities. Ministers are directly responsible to Elijah Muhammad; the Captains and Lieutenants to the Minister. It is stated:

"In the Mosque proper the minister is the final authority * * *. The Captains are the chief law enforcers of the Mosque. * * * It is also the job of the F. O. I. Captain to come to the aid of the F. O. I. and M. G. T. believer individually and to rally the Nation behind any of our brothers or sisters who have been wronged or misused in the name of religion."

Page 18 of the brochure consists of "General Orders," a slightly changed version of the General Orders every Army recruit was once required to memorize, with the same references to sentinels, Commanding Officers, and officers of the day and of the guard.

12. During the months of March and April, 1970, the respondents and other officers at the penitentiary came to the conclusion that tension was building up between separate groups of Black Muslims, and between some of the Black Muslims and non-Muslim inmates. This conclusion was based on the occurrence of fights between prisoners, observation of the inmates (including the petitioners), interviews with inmates, and the respondents' experience at the penitentiary and at other federal penal institutions where they had served.

13. A separate file was maintained at the penitentiary for each inmate. These files were available to the respondents and each contained information as to the criminal record of the subject inmate, and all reported infractions of disciplinary rules at federal penal institutions where that inmate had been confined.

14. At no time was any action taken by any respondent solely because of the race or religious belief of the petitioner who was the subject of that action. In each instance in issue the action taken by any respondent with respect to any petitioner did not differ from the action which would have been taken against any other inmate of the penitentiary under the same circumstances.

15. In each instance that action was taken by a respondent against a petitioner, there existed probable cause to believe that the petitioner involved was engaged in concert with others, in disruptive activities calculated to destroy discipline and order within the penitentiary and posing a threat to other inmates and to the safety and security of the penitentiary.

### Specific

16. *Long.* Long was serving a life sentence for murder in the first degree and robbery. He was confined in "CU" from April 27, 1970 to October 14, 1970, and in "CCU" from October 14, 1970 to time of trial. He claimed to be a minister of the inmate population of the members of the Nation of Islam at the penitentiary (Tr. 32). He stated on one occasion to respondent Putman that Muslim inmates at the penitentiary followed his orders directly. His file contains reports of disciplinary action at Leavenworth and at other penal institutions for fighting, insubordination and other violations.

He was placed in segregated confinement because the respondents had reason to believe that Long had incited or ordered the stabbing of an inmate White by petitioner Barron on April 27, 1970, and had incited or ordered assaults on an inmate Winkfield by petitioners Malry and Caver, and another upon inmate Hayes by petitioners Mayes, Cargill and Dennis on the same date. Respondents had probable cause for their belief because of Long's known association with and domination of the active assailants, and because of reliable reports of friction between Long and the victims, who were members of the rival Black Muslim group. While in segregated confinement, he threatened the life of correctional officer Daniels. At the time of trial, there was no reason to believe that Long could be released from segregated confinement without endangering the safety and security of the penitentiary.

17. *Duhart.* Duhart was serving a twenty-five-year sentence for bank rob-bery. He was confined in "CU" from April 27, 1970 to December 30, 1970, and in "CCU" from December 30, 1970 to time of trial. He claimed to be a captain in the Nation of Islam at the penitentiary. He instructed other Black Muslims in boxing, judo and karate. His file contains reports of disciplinary action at Leavenworth and at other penal institutions for fighting, insubordination and other violations.

Duhart, before inmate White was knifed on April 27, 1970, circulated mimeographed statements among Black Muslim inmates that White and others were not true Muslims but "hypocrits." While instructing Black Muslim inmates in karate, the pupils under his direction shouted, "Kill the hypocrites." He associated closely with Long, Malry, Caver, Crable and Barron. During the week preceding April 27, 1970, Duhart stated during a conversation at the shoe factory that he was going to hurt someone. The respondents had probable cause to believe that he was involved in the attacks of April 27. While in segregated confinement he was discovered in possession of two ropes braided from sheets. At the time of trial there was no reason to believe that he could be released from segregated confinement without danger to the safety and security of the penitentiary.

18. *Pina.* Pina was serving a sixteen-year sentence for bank robbery. He was confined in "CU" on April 27, 1970, and again on January 20, 1971 to the time of trial. He claims to be secretary of the Black Muslims at Leavenworth. His file contains reports of disciplinary action at Leavenworth and other federal penal institutions for insubordination and other violations.

The respondents, in placing Pina in segregated confinement, considered the fact that shortly before inmate Jesse J. White was the victim of a knife attack in the laundry at the penitentiary, Pina and petitioner Thomas were seen walking away from the laundry building which was for him an unauthorized area at the time. Being questioned, he

refused to explain his presence in the area and refused to answer questions. Respondents had probable cause to believe that he had something to do with the knife attack on White. Further, he was out of bounds and refused to explain his presence in the area. At the time of trial, respondents had no reason to believe that Pina could be released from segregated confinement without endangering the safety and security of the penitentiary.

19. *Caver*. Caver was serving a sentence of ten years for possession of stolen mail and for uttering a forged check. He was confined in "CU" from October 22, 1970 until he was released from custody by court order, November 17, 1970. His file includes reports of assault on another inmate, insubordination and possession of a rope made of sheets. He participated with Malry in an attack upon inmate Winkfield on April 27, 1970, one of three assaults perpetrated that day. While in the control unit he persistently shouted obscene and provocative statements to the correctional officers assigned to that unit. At the time of trial there was no reason to believe that he could be released from segregated confinement without endangering the safety and security of the penitentiary.

20. *Stokes*. Nothing in the record indicates the term of the sentence being served by Stokes. He was in confinement in "CU" from April 27, 1970 to August 20, 1970, and in "CCU" from August 20, 1970 to March 11, 1971, when he was returned to the general population.

Respondents had probable cause to believe that he was either involved or had prior knowledge of the attacks on inmates White, Hayes and Winkfield, all on April 27, 1970. He was ordered out of the laundry, the scene of the knife attack on White, within a few minutes before that attack; and at the time of the assaults on Winkfield and Hayes, he was in the vicinity.

21. *Barron*. The record does not disclose the term of the sentence being served by Barron. He testified that he had been admitted to the penitentiary on April 19, 1968. He was confined in "CU" from April 27, 1970 to the time of trial. At one time during his confinement the adjustment committee gave him a choice as to whether he would remain in "CU" or be transferred to "CCU." He said: "It's up to you," and was not transferred to "CCU."

On April 27, 1970, inmate White, the victim of a knife assault in the penitentiary laundry, identified Barron as the man who had assaulted him. Because of the identification by White, coupled with two other weaponless assaults on the same date, and because of the reports of rivalry between factions within the Black Muslim group at the penitentiary, the respondents had probable cause to believe that the safety and security of the penitentiary would be endangered unless Barron was placed in segregated confinement. During his time in the control unit, Barron, together with petitioners Long and Malry, threatened the life of correctional officer Daniels. At the time of trial the respondents had no reason to believe that Barron could be released from segregated confinement without endangering the safety and security of the institution.

22. *Mayes*. Mayes was serving an eighteen-year sentence for the offense of bank robbery. He was confined in "CU" from April 27, 1970 to August 26, 1970; in "CCU" from August 26, 1970 to September 17, 1970; and again in "CU" from November 5, 1970 to March 16, 1971.

On April 27, 1970, Mayes, together with petitioners Cargill and Dennis, made an assault upon inmate Herbert B. Hayes, inflicting abrasions and bruises. The fact of this assault and the occurrence of two other assaults on the same date, all connected with rivalry between factions of Black Muslims within the penitentiary, gave the respondents probable cause to believe that Mayes's segregated confinement was necessary to protect the safety and security of the institution. While in the control unit, he was

offered a transfer to "CCU" which he at first refused, but upon reconsideration accepted, and he was immediately transferred to "CCU."

23. *Cargill.* Cargill was serving a ten-year sentence for bank robbery. He was confined in "CU" from April 27, 1970 to August 20, 1970; in "CCU" from August 20, 1970 to August 29, 1970; and in "CU" from November 9, 1970 to November 13, 1970.

His file disclosed disciplinary reports at federal penal institutions for fighting and for failing to attend class sessions. He participated with Arvester Mayes in an assault upon inmate Herbert B. Hayes on April 27, 1970. He was closely associated with the Black Muslim group led by petitioner Long. The respondents had probable cause to believe that his freedom from segregated confinement would pose a threat to the safety and security of the penitentiary. At the time of trial he had been released from segregated confinement.

24. *Dennis.* Dennis was serving a five-year sentence for possession of narcotics. Since the inception of these actions he has been released from the penitentiary. He did not testify at the trial.

Dennis, together with petitioners Mayes and Cargill, assaulted inmate Hayes on April 27, 1970. He associated closely with Long, Malry, Caver, Duhart and others in the Black Muslim group led by Long. The respondents had reason to believe that his freedom from segregated confinement would pose a threat to the safety and security of the penitentiary.

25. *Chapman.* Chapman was serving a twenty-year sentence for bank robbery. He was confined in "CU" from April 27, 1970 to March 22, 1971 and from March 22, 1971 to March 31, 1971 in "CCU." On April 27, 1970, when officers were escorting petitioner Duhart to the control unit, Chapman, together with petitioners Jones and Stokes, belligerently objected to Duhart's being in custody. Because of the tension then prevailing, and because of Chapman's close association with Jones and Duhart and others led by Jones, the respondents had probable cause to believe that Chapman's freedom from segregated confinement would pose a threat to the safety and security of the penitentiary. At the time of trial there was reason to believe that his release from segregated confinement would endanger the safety and security of the penitentiary.

26. *Crable.* Crable was serving a twenty-year sentence for bank robbery. He was confined in "CU" from April 27, 1970 to January 12, 1971; in "CCU" from March 6, 1971 to March 10, 1971; and in "CCU" from March 10, 1971 to April 16, 1971. His file contains disciplinary reports for fighting, for destruction of government property, for illegal entry into the recreation building, and for possession of contraband.

Crable was reported by other inmates as having been in the vicinity of the laundry where White was stabbed at the time of the assault on White, and was described by them as having been "on guard." Because of this and his close association with the Black Muslim group led by Long, and in the light of the tense situation then prevailing, the respondents had probable cause to believe that Crable was involved in one or more of the assaults occurring on April 27 and that his freedom from segregated confinement would pose a threat to the safety and security of the penitentiary. At the time of trial there was reason to believe that his release from segregated confinement would endanger the safety and security of the penitentiary.

27. *O'Neal.* O'Neal was serving a three-year sentence for theft from a government reservation. He was confined in "CCU" from September 6, 1970 to September 9, 1970; in "CU" from October 6, 1970 to October 29, 1970; in "CCU" from October 29, 1970 to March 4, 1971; and in "CCU" from March 6, 1971 to April 22, 1971, when he was transferred to another federal penal institution. When he was returned for court appearance he was confined in

"CCU" from May 31, 1971 to the time of trial. On October 6, 1970, O'Neal objected strenuously to the presence of a custodial officer at Muslim services and told respondent Putman that he, Putman, was treading on dangerous ground in enforcing the regulation requiring the presence of an officer at Muslim services; and that the Muslims would not accept this practice. His file contains reports of disciplinary action at penal institutions for insolence, fighting and threatening an officer. He was a close associate of that faction of the Black Muslims led by Ford. He was placed in segregated confinement because the respondents had probable cause to believe that unless segregated he would incite and participate in active rebellion against the regulation requiring the presence of a custodial officer at Black Muslim services. At the time of trial there was reason to believe that his release from segregated confinement would adversely affect the safety and security of the institution.

28. *Thomas.* Thomas was serving a twenty-five-year sentence for bank robbery and conspiracy. He was confined in segregated confinement from October 12, 1970 and remained in segregated confinement until the time of trial. Thomas, together with Reed and Ford, expressed defiance of the regulation requiring the presence of a custodial officer at Black Muslim meetings. Respondents had probable cause to believe that he would incite and participate in active rebellion against the regulations of the institution. At the time of trial there was no reason to believe that his release from segregated confinement could be effected without danger to the safety and security of the penitentiary.

29. *Jones.* The record does not disclose the term that Jones was serving, nor does it reflect the period of time that he was in segregated confinement. Jones was a close associate of the group of Black Muslims led by Ford. He was in the vicinity of the laundry, together with Muslim inmates Mickens and Stokes, immediately before inmate White was stabbed. Stokes had been ordered to leave the laundry only minutes before the assault on White and rejoined Mickens and Stokes following his ejection. The respondents had probable cause to believe that unless segregated from the general population of the penitentiary Jones would participate actively in physical resistance to enforcement of the regulations of the institution and would incite others to join with him in such activities. At the time of trial he had been transferred to another federal penal institution.

30. *Rose.* The record does not disclose the sentence being served by Rose, nor does it reflect the period of time that he was held in segregated confinement. He was one of the group of Black Muslims following the leadership of Ford and often acted as spokesman for that group. He led members of that group in close order drills in the penitentiary yard and persisted in so doing after having been warned that this would result in punitive action. The respondents had reasonable grounds to believe that Rose would resist actively their efforts to enforce discipline and control within the penitentiary and would incite others to so resist.

31. *Reed.* Reed was serving a twenty-five-year sentence for bank robbery. He was confined in "CCU" from October 5, 1970 to March 26, 1971; in "CU" from March 26, 1971 to May 7, 1971. He was one of the spokesmen and leaders of the group of Black Muslims which recognized Ford as minister. He strongly objected to the regulation requiring the presence of a custodial officer at Black Muslim meetings, and participated in organized drills on the recreation yard of the penitentiary. His file contains a report that in April of 1970 he participated in a disturbance at the Federal Detention Headquarters in New York City during which a custodial officer was taken hostage. On that occasion order was restored only through the use of tear gas. His file contains other reports of belligerent activity, including threats to officers. The re-

spondents had reason to believe that Reed, unless placed in segregated confinement, would incite others to participate and would himself participate in active physical resistance to the regulations of the institution, and would pose a threat to the safety and security of the penitentiary.

32. *Moore.* Moore was serving a sentence of twenty-five years for bank robbery. He was confined in "CU" from October 5, 1970 to January 20, 1971, and in "CCU" from January 20, 1971 to March 26, 1971. His file contains reports of disciplinary violations. He has state detainers from the State of New Jersey charging carrying concealed weapons, stolen property, stolen auto vehicle, and assault with intent to rob. He was one of the group of Black Muslims recognizing Ford as minister and, together with Ford and Rose, protested vigorously against the regulation requiring the presence of a custodial officer at Black Muslim meetings. The respondents had reasonable cause to believe that his segregated confinement was necessary to preserve order and discipline in the penitentiary, and that his continued confinement during the time he was so held was necessary to insure that he would not participate actively in physical resistance to the regulations of the institution and incite others to so act.

## CONCLUSIONS OF LAW

■ 1. The burden of proof is on the petitioners and the intervening petitioners to establish the allegations of their complaints. They have not met this burden.

■ 2. " * * * (T)he basic responsibility for the control and management of penal institutions, including the discipline, treatment, and care of those confined, lies with the responsible administrative agency and is not subject to judicial review unless exercised in such a manner as to constitute clear abuse or caprice upon the part of prison officials." Bethea v. Crouse, 417 F.2d 504, 505–506 (10th Cir. 1969). The evidence in this case does not show abuse or caprice on the part of the respondents.

■■ 3. Segregated confinement of inmates reasonably considered to be threats to themselves, others, or to the safety and security of the institution is lawful and does not constitute any violation of the constitutional rights of inmates so segregated. Graham v. Willingham, 384 F.2d 367 (10th Cir. 1967). The segregated confinement of the petitioners and intervening petitioners was the result of the considered judgment of the respondents and was not arbitrary.

■ 4. The petitioners and intervening petitioners, while in the custody of the respondents, have only such rights in the practice of their religion as can be exercised without impairing the requirements of prison discipline. Sostre v. McGinnis, 334 F.2d 906 (2d Cir. 1964).

■ 5. Inmates of a penal institution have no judicially enforceable right to advocate open defiance of authority within the prison walls. Roberts v. Pepersack, 256 F.Supp. 415, 429 (D.Md. 1966).

■ 6. It was and is the respondents' duty to provide for the " 'proper government, discipline, treatment, care, rehabilitation, and reformation.' 18 U. S.C.A. § 4001," not only of the petitioners, but also of all other inmates charged to their keeping. Jones v. Willingham, 248 F.Supp. 791, 793 (D.Kan. 1965).

■ 7. In the proper exercise of their responsibilities, prison officials are justified in placing in segregated confinement inmates reasonably believed to be engaged in the organization or maintenance of a power group within the institution calculated to permit the establishment of control by that group over other inmates.

■ 8. In the proper exercise of their responsibilities, prison officials are not required to withhold action until mass violence erupts in the prison under their charge. If in their judgment, based upon their experience, expertise, and reliable information, they reasonably believe that individual prisoners or

groups of prisoners are inciting or provoking violence or breach of prison discipline, it is their duty to segregate such inmates from the general prison population. It is also their duty to frequently review the situation and to release the segregated inmates from confinement when this can be done without affecting the security, safety, good order or discipline of the institution. They have the corresponding right and duty to retain such individuals until, in their reasonably informed judgment, their release will not threaten the security, safety, good order or discipline of the institution.

## JUDGMENT

It is ordered and adjudged that the respondents have judgment on all issues; that all relief sought by the petitioners and intervening petitioners be denied; that each of the above-captioned cases be dismissed as frivolous; and that judgment for costs be entered proportionally against the petitioners-plaintiffs, execution therefor to issue upon the request of counsel for the respondents.