**Anthony CARLO et al., Plaintiffs,**

v.

**Frank GUNTER et al., Defendants.**

**Civ. A. No. 75–359–S.**

United States District Court,
D. Massachusetts.

April 29, 1975.

Richard Shapiro, Prisoner's Rights Project, Boston, Mass., for plaintiffs.

John W. Irwin, and Michael C. Donahue, Asst. Attys. Gen., Robert A. Bell, Mass. Dept. of Correction, Boston, Mass., for defendants.

## FINDINGS AND RULINGS

SKINNER, District Judge.

This Complaint dated January 27, 1975, is brought under the Civil Rights Acts (42 U.S.C. § 1983) for injunctive relief and for damages. Plaintiffs' motion for a temporary restraining order was denied after hearing on January 28, 1975. Plaintiffs' motion for reconsideration was denied on January 31, 1975. A memorandum of findings and ruling was filed by me on February 5, 1975. On February 10, 1975, hearings were commenced at the Massachusetts Correctional Institution, Walpole, on the motion for a preliminary injunction, and continued at the courthouse on the alleged violation of Eighth Amendment Rights on February 11, 12 and 13. Further hearings were held on February 18 and 19 on the alleged deprivation of due process in connection with transfers hereinafter described.

The parties agreed that the hearing on the motion for a preliminary injunction be consolidated with the hearing on the merits as to so much of the complaint as seeks injunctive relief, and it was so ordered pursuant to Fed.R.Civ.P. 65(a). The plaintiffs were given until February 24, 1975 to file a brief, and the defendants until March 10, 1975 to file a reply brief.

At the hearing at Walpole on February 10, 1975, the Court took a view of Cell Blocks B–8, B–4, A–1 and 10.

## FINDINGS OF FACT

### A. *Background*

For some years the Massachusetts Correctional Institution at Walpole (hereinafter referred to as "Walpole"), which is the maximum security prison in the Massachusetts correctional system, has been a scene of virtually continuous disruption. During 1974 the Norfolk County Grand Jury returned 48 indictments for assaults within the institution. There was a murder and five attempted murders, two suicides and one major disturbance. Seven guns were found in the institution. Within the past three years there have been fifteen murders at Walpole.

In early 1974 there was a correctional officers' strike. During the strike some

of the inmates "reassigned" themselves from cells in the maximum security B blocks to the medium security A blocks.

On December 26, 1974, as a result of a murder which had occurred at Walpole, and the finding of several guns and a supply of ammunition in the institution, the entire institution was "locked up." All prisoners were confined in their cells, except for about an hour of exercise per day. They were fed in their cells. All programs which required the inmates to be out of their cells were discontinued.

B. *The Reassignment of Housing for all the Inmates*

This was the situation which existed when the defendant Gunter was appointed superintendent of Walpole on December 31, 1974. Upon his assumption of this post he determined to make a survey of the population of the institution, and to segregate potentially dangerous and disruptive inmates in the "B" wing of the prison. The purpose of this was to provide an opportunity for the prisoners in the "A" wing to participate in various rehabilitation programs without fear of violence and disruption.

The defendants collectively devised the following plan:

Louis Berman, Deputy Superintendent of the Reception Diagnostic Center, was placed in charge of the survey and housing reassignment of the inmate population of Walpole. The Reception Diagnostic Center is a division of the Department of Correction which initially classifies prisoners and assigns them to particular housing in the appropriate institution when they are first committed.

Five committees were formed for the purpose of carrying out the survey. The chairman of each committee was either a treatment director or chief social worker from another institution. The other members were one correction officer and one social worker, both from the Walpole staff. In general, the appointments were made so that the correction officer would have had personal knowledge of the inmates who were assigned to that particular committee. The function of the committee was to review the institutional file of each inmate, interview him and fill out a survey report for each inmate. The completed questionnaires were then reviewed by a committee consisting of Berman and Deputy Superintendents Butterworth and Waitkevich, who then designated the general housing classification for each inmate with an "A" or "B" endorsed on the top of the report.

The interviews conducted by the committees were longer than the two or three minutes testified to by the plaintiffs. The range of subjects which they themselves report as having been discussed could not have been encompassed in so short a time. They were brief, however, and far short of comprehensive. In general, favorable aspects of the inmate's file, and favorable comments of the correction officer were discussed in the presence of the inmate. I infer, although it is not completely clear, that the inmate also had the opportunity to call to the committee's attention those aspects of his prison activities which he considered to be to his advantage. Adverse aspects of his record, and unfavorable comments by the correction officer were considered out of the presence of the inmate, however, and he had no opportunity to respond to or challenge them.

In making the actual housing assignment, Berman, Butterworth and Waitkevich relied on their personal knowledge of some inmates, and the inmates' reputations in the prison community, as well as on the survey reports. Some of the plaintiffs were considered by one or more of these three defendants to be members of the "wrecking crew," a term used by both inmates and staff to designate a group of inmates who were thought to be consistently involved in fomenting disruption and violence within the institution. After the housing decisions were made, the survey reports were reviewed by Superintendent Gun-

ter. He was also informed by Butterworth and Waitkevich that certain of the plaintiffs were considered by them to be members of the "wrecking crew." Gunter endorsed the initials "WC" on the bottom of the survey reports which referred to those plaintiffs. None of these matters were discussed with the plaintiffs either before or after the housing assignment was made.

On January 9, 1975, prior to the interviews by the five committees, all the inmates were given the following notification from the defendant Gunter:

"In connection with my interest in resuming operations at MCI–Walpole, I am requesting that you meet with a classification committee that shall review your current classification status and program needs as they relate to placement within MCI–Walpole."

Inmates were subsequently advised of their right to appeal their housing assignments and were given a form on which to do so. The appeal board consists of Gunter and two deputy commissioners of the department. A number of appeals have been considered, and in some cases the housing assignment has been changed as a result. Inmates do not appear in person before the appeals board.

The reclassification program is a continuing program, and, according to Deputy Superintendent Waitkevich each inmate's housing assignment will be the subject of continuous review.

In December 1974, the defendant Hall, as Commissioner of Correction, promulgated a series of Departmental Orders, 4400.1 through 4400.7, which prescribed a detailed program for classification of inmates, and the preparation and maintenance of appropriate case records. Included are hearing procedures and detailed criteria to be applied. These procedures are to be followed whenever an inmate is transferred from medium security housing to maximum security housing.

The housing reassignment of the plaintiffs described above did not comply with the provisions of these orders, in particular, Section 4.2 of Order 4400.-2. I find further that the plan devised by the defendants for the survey and reassignment of inmates was not an "Institutional Classification Plan" within the meaning of Order 4400.1, Section 4.-3. Such a plan is supposed to provide a permanent framework for reclassification within the institution in accordance with departmental procedures. The plan devised by the defendants in the present case was an ad hoc plan to deal with the breakdown of administrative control of Walpole.

I find that the situation at Walpole was correctly perceived by the defendants as an emergency, requiring the immediate reorganization of the entire institution.

The procedures mandated by Departmental Orders 4400.1 et seq., were not designed for such a situation and are ill suited therefor. They clearly contemplate the reclassification of individual inmates in the due course of their progress in the institution (or regression as the case may be).

I find that the defendants intended in good faith to devise an emergency plan for housing reassignments at Walpole which would conform as closely to the principles of Orders 4400.1 and 4400.2 as was consistent with their estimate of the need of a speedy resolution of the crisis at Walpole.

As a result of the inmate survey and housing assignments, all of the plaintiffs were assigned to the "B" section of Walpole.[1] Most of the plaintiffs were previously in Block A–1. Four of the plaintiffs were already in the "B" section. The specific housing assign-

---

1. The overall moving plan resulting from the survey and reassignment called for 41 inmates to move from A to B, 50 from B to A and 60 to move to different blocks within the B section. The moves within the B section were the result of a decision to use one B block for protective custody and another B block for the orientation of new inmates.

ment for all of the plaintiffs was to Block B–8.

## C. *Adverse Conditions of Confinement Resulting from the Reassignment*

The conditions of confinement in the "B" wing of the institution, and particularly in Block B–8, at the time of the hearings above described, were substantially more adverse than in the "A" wing. The inmates in the "A" wing had been returned to a relatively normal program that permitted reasonable freedom of movement throughout the institution, regular visiting privileges and the resumption of rehabilitative programs. The inmates of Block B–8 remained "locked up." Other sections of the "B" wing were in various stages of relaxation of the lock-up.

These severe restrictions in Block B–8 were the result of events hereinafter described, and were not contemplated at the time of the housing reassignment.

Nevertheless, the contemplated level of security in the "B" wing, even assuming the most favorable projection described by Superintendent Gunter, is more stringent than it is in "Block A," or than it was in "Block B" before the lock-up of December 26, 1974. In general, inmates assigned to the "B" wing of the institution will not have the freedom of the institution nor will they mingle with the inmates of the "A" wing. Meals will be served in the blocks and various rehabilitation and recreational programs will be offered in special areas in the "B" section rather than in the school, library, shop and other specialized areas available to inmates of the "A" block. Visiting privileges are fewer, more circumscribed as to number of visitors and subject to prior approval by the administrative officers of the prison. The cells, recreational areas, eating facilities and visiting areas are less desirable than those available to inmates in the "A" section. There is no privacy in the cells. An inmate assigned to the "B" section is less likely to be considered for transfer to a medium security institution, for furloughs and for parole, than an inmate assigned to the "A" section.

## D. *The Plaintiffs' Response to the Move*

On January 20, notices of the changes in housing assignment were delivered to all of the inmates at Walpole. Preparations had been made by the Superintendent to carry out the move on the same day. Based upon his experience in other correctional systems, he anticipated that some of the inmates would forcibly resist the moves. He therefore assigned two teams of correction officers, of six men each, to move each inmate. The correction officers were equipped with riot gear, including helmets and riot sticks. After the commencement of hostilities hereinafter described, each team also had a large plastic shield designed for use in riots.

The difficulties of January 20 began early in the morning with the refusal of the plaintiff Rooney to leave his cell to appear in Court. The plaintiff Rooney at this time was housed in Cell Block A–1. Each cell in Cell Block A–1 is equipped with a sliding door. At sometime in the past, presumably during the correction officers' strike of 1974, these doors were drilled by the inmates in such a way that they could be locked from the inside by the insertion of a pin. Rooney locked his door in this fashion. The Deputy Superintendent thereupon ordered one of the riot-equipped moving teams to remove Rooney. The team of correction officers opened Rooney's door by force and after a considerable scuffle, in which Rooney used a broom handle and such other objects as came to his hand, he was forcibly removed. In the course of the scuffle, Rooney was injured and he was immediately taken to the prison infirmary.

The moving team then came into Block A–1 to move those inmates who were going to Block B–8. The inmates, including most of the plaintiffs, "pinned" their doors. The plaintiffs Wilson and Devlin shouted to the other inmates to "rip out," or some similar

words, which meant for them to break off the washstands and toilets in their cells. Many of the inmates then tore out the toilets and washstands, broke them in pieces and threw the pieces at the correction officers. They also broke up their beds and other furniture and used the pieces as weapons and missiles. Which of the plaintiffs participated in this activity, and the extent of participation of each, is not revealed by the evidence with any degree of precision.

The moving teams were equipped with protective plastic shields and crowbars to open the doors at this point, and then proceeded to move the plaintiffs, one by one, to Block B–8.

The plaintiffs LeBeau, Wilson and Devlin were among the first to be moved. After several of the plaintiffs had been placed in Block B–8, at the instigation of Wilson and Devlin, they proceeded to tear out the toilets and washstands in the cells, break up the porcelain sections, break up their beds and throw the pieces of porcelain and wood at the correction officers.[2] As more of the plaintiffs were brought into the block, they joined in this activity. The blocks became littered with broken porcelain and flooded with water.

The plaintiffs were all placed in the second and third tiers of Block B–8. The first tier was already occupied by inmates in protective custody. I find, contrary to the plaintiffs' contention, that the cells on the second and third tiers were equipped with functioning toilets and washstands at the time that the plaintiffs were placed there. The fixtures were connected and the water was turned on; otherwise, the block would not have been flooded.

The water was turned off by the prison officials. The broken sections of toilets and washstands were removed by correction officers. While it was alleged by the plaintiffs that correction officers also broke and removed undamaged fixtures, there was no evidence that this happened. There were some "unbreakable" aluminum toilets available at Walpole, but they were used to replace the broken toilets in Block A–1. The broken fixtures on the second and third tiers of Block B–8 were not replaced and the water remained off. The protective custody prisoners in the first tier were removed to another block. One cell on the second tier had undamaged plumbing and running water. The prisoners were permitted to use this facility, one at a time, accompanied by a guard.

This situation continued for two and one-half weeks, until February 6, 1975. During this period near riot conditions existed on the block. The inmates had limited access to toilet facilities and often chose not to use what they had. They urinated and defecated in paper cups or on the floor, or over the rail of the tier onto the flat below. They threw their excrement on the floor, on the wall opposite the tiers, at the windows of the guard station opposite the tiers, and at the correction officers. They ate their food in their cells, without utensils except for plastic bowls. There was continual violence and provocation on the part of both officers and inmates throughout this entire sequence of events.

Superintendent Gunter ordered that the cell block be cleaned out and hosed down every second day, and that the inmates be provided with disinfectant to clean their cells. I find that this order was in the main carried out, though the cleaning was probably not done as often as ordered. In any case, the cell block remained a filthy place, creating a substantial risk of disease, including dysentery and infectious hepatitis. Some of the plaintiffs exhibited some symptoms of these diseases.

2. The evidence strongly suggests that this conduct was instigated by the plaintiff Wilson, who egged the others on, while prudently refraining from damaging his own equipment. Consequently, he had water and a toilet for himself during most of the period hereinafter described, until he managed to be removed to the infirmary for a "skin condition."

During this period there were other cells in the "B" wing of the prison which were fully equipped and to which the plaintiffs could have been transferred. There were 15 such cells on the first tier of Block B–8.

The Superintendent was of the opinion that the plaintiffs were likely to repeat their destructive behavior in any new accommodations, and determined not to make the move until the "near riot" condition in Block B–8 abated. The situation continued with little change until February 6. Even on that day, the plaintiff Carlo set a fire in the block, and the exchange of hostilities between inmates and officers, accompanied by the throwing of excrement by inmates, while somewhat moderating, was continuing. Superintendent Gunter nevertheless determined that at that point it was worth "taking the risk" of moving the plaintiffs to fully equipped cells. As a result, 15 of the plaintiffs were moved to the first tier and the others were removed to other cell blocks. I find that the Superintendent's decision not to move the plaintiffs until February 6, and his decision to move them on that day were both made in good faith. I cannot now find that either decision was unreasonable. The plaintiffs did not tear out the toilets and sinks in the new cells.

E. *Other Allegations of Bad Conditions*

Plaintiffs also offered testimony that Cell Block B–8 is badly ventilated and heated. The heating and ventilating systems are the same as those existing in other parts of the "B" wing. I accept the uncontradicted testimony that they are inefficiently designed. The Court's view of the cell block was taken on one of the coldest days of the past winter. Outside temperature was between ten and twenty degrees Fahrenheit. The temperature in Cell Clock B–8 was probably in the low sixties. The inmates were dressed in ordinary indoor clothing, except for one or two who had put on light jackets. There is a noticeable contrast with most of the rest of the prison, which is grossly and unhealthily over-heated, with temperatures in the high seventies and eighties.

F. *The Special Cases of Hayes and Dibara*

There remains to be considered the cases of plaintiffs Hayes and Dibara. Both of these inmates were scheduled to remain in Block A–1 as a result of the survey and housing assignments. These assignments were changed to Block B–8, on the morning of January 20, as a result of their alleged participation in the disruption in Block A–1 on that morning. I find that this reassignment to Block B–8 was punishment for specific conduct. As such, it was disciplinary in nature and not a part of the general administrative reorganization of Walpole.

OPINION

1. DUE PROCESS

■ Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), established that prisoners are entitled to due process in disciplinary proceedings resulting in grievous loss, which includes transfer to substantially more adverse conditions of confinement. The degree of process due is based on an assessment of the degree of deprivation to the prisoner, balanced against the burden on the prison administration. Further, "emergency situations may require postponement of whatever procedures are prescribed." Gomes v. Travisono, on consideration after remand, 510 F.2d 537 (1st Cir. 1974).

■ No case cited by the parties has dealt with the reorganization of an entire institution under the crisis circumstances disclosed in this case. It seems clear to me, however, that the prison administration was not required to afford a full hearing of the sort described in *Wolff* or in its own regulations 4400.1 et seq., to each of several hundred inmates whose conditions of confinement were adversely changed either as a result of a move from the "A" wing to the "B" wing or as a result of remaining in the

"B" wing under the more severe restrictions which now apply.

■ Under these circumstances, the administration was fully justified in relying in part on the personal assessments of correction officers and administrators who had personal knowledge of each inmate, where as here, each step in the procedure required a group decision. The impact of individual prejudices was thus minimized.

■ Similarly, the inmate's reputation in the institution was properly taken into account. I see no reason why prison inmates should escape their reputations any more than other people do.

The deficiency in the procedure was that adverse aspects of the inmate's record and unfavorable comments by prison staff were considered out of the inmate's presence. He had no opportunity to refute, rebut or explain them. This must be counted a serious deficiency.

The question then is this:

Was the detriment to the plaintiffs in being reassigned to the "B" wing so severe as to require a hearing in which they had an opportunity to rebut, refute and explain adverse aspects of the record and unfavorable comments by officers?

■ I have been cited to no case that evolves out of an institutional situation such as that described above. Even recognizing the cases in other circuits which extend the *Wolff* rule into great varieties of prison situations, I am of the opinion that the deficiency in the procedure which I have identified, in all of the circumstances of this case, does not justify judicial intervention.

There are additional factors, which, while they do not contribute to the above opinion, tend to confirm it. The first is that the process of reclassification is continuing, and those plaintiffs who demonstrate the qualifications for an assignment to the "A" wing will presumably have the opportunity to be transferred there in due course. The second is that in view of the plaintiffs' conduct on the day of the move and subsequently, it is difficult to believe that any serious mistake was made in assigning them to the "B" wing.

## 2. CRUEL AND UNUSUAL PUNISHMENT

■ If the conditions existing in Cell Block B–8, between January 20 and February 6, 1975, had been imposed on the plaintiffs by the defendants there would have been a violation of the Eighth Amendment, meriting the most severe condemnation. These conditions were not imposed on the plaintiffs, however; they were created by them. I have found that Superintendent Gunter's response was not unreasonable. That finding disposes of the matter.

## 3. THE SPECIAL CASE OF HAYES AND DIBARA

■ It would appear that Hayes and Dibara were reclassified to Cell Block B–8 as a result of specific prior conduct without the hearing as to that specific conduct required by this Court's decision in Daigle v. Hall, 387 F.Supp. 652 (Mass.1975). Accordingly, they must be returned to the "A" wing until such a hearing is afforded them. The circumstances of their transfer to Block B–8 were so much a part of the emergency conditions at Walpole on January 20, however, as to make inappropriate any award of damages.

## 4. CONCLUSION

Except as to Hayes and Dibara, the plaintiffs have suffered no deprivation of their constitutional rights under either the Eighth or Fourteenth Amendments. Accordingly, a judgment shall enter requiring that Hayes and Dibara be returned to the "A" wing until they have been afforded a hearing as to their participation in the riot in Block A–1 on January 20 and dismissing the complaint in every other respect.