Louis W. HODGES et al., Plaintiffs,

v.

Ann KLEIN et al., Defendants.

Clifford F. LEWIS, Plaintiff,

v.

Alan R. HOFFMAN, Defendant.

John WASHINGTON, Plaintiff,

v.

Alan R. HOFFMAN, Defendant.

Charles E. ALLEN, Plaintiff,

v.

Ann KLEIN et al., Defendants.

Joseph MOSS, Plaintiff,

v.

Alan HOFFMAN, Defendant.

Civ. Nos. 75–2260, 75–2214, 76–72, 76–399 and 76–544.

United States District Court, D. New Jersey.

Oct. 1, 1976.

Louis W. Hodges, pro se.

Earnest Pace, pro se.

Leora Mosston, Prisoners' Rights Organized Defense, Newark, N. J., Charles H. Jones, Jr., Stephen Latimer, Prison Law Clinic, Rutgers University School of Law, Newark, N. J., for plaintiffs.

William F. Hyland, Atty. Gen. of N. J., by Joseph T. Maloney, Richard H. Mills, Deputy Attys. Gen., Trenton, N. J., for defendants.

Stanley C. Van Ness, Public Advocate of New Jersey, by Jeffry Mintz, Trenton, N. J., amicus curiae.

## OPINION

CLARKSON S. FISHER, District Judge.

■ This opinion marks another chapter in a major piece of litigation which has already produced a series of temporary restraining orders, numerous discovery and other miscellaneous orders, a preliminary and now permanent injunction, and a reported opinion. *Hodges v. Klein,* 412 F.Supp. 896 (D.N.J.1976). The case essentially involves a constitutional challenge to the creation and maintenance of a special unit at Trenton State Prison known as the Management Control Unit (hereinafter referred to as the MCU).[1] Several other cases have either been consolidated with or are very similar to the instant matter,[2] and the Court has certified a plaintiff class for purposes of this suit.[3] The plaintiffs seek a permanent injunction which would close down the unit or alter its operation. The defendants are Ann Klein, the Commissioner of the New Jersey Department of Institutions and Agencies, William H. Fauver, the Director of the Division of Correction and Parole, Alan R. Hoffman, Superintendent (Warden) of Trenton State Prison, William Anderson, Chief Deputy at Trenton State Prison, and Robert Simmons, corrections captain.[4] Shortly *after* the completion of extensive hearings on this matter, the Division of Correction and Parole promulgated Standards for the operation of

---

1. The action was brought under 42 U.S.C. § 1983, and the Court has jurisdiction under 28 U.S.C. § 1343.

2. *Allen v. Klein,* Civil No. 76–399 ordered consolidated with the instant action. *Washington v. Hoffman,* Civil No. 76–72 ordered consolidated with the instant action. *Lewis v. Hoffman,* Civil No. 75–2214 ordered consolidated with the instant action. *Moss v. Hoffman,* Civil No. 76–544 ordered consolidated with the instant action. *Hickman v. Klein,* Civil No. 75–2210; *Hunterson v. Klein,* Civil No. 76–715 both raise some issues regarding MCU which are very similar to the instant case.

3. In an order entered March 2, 1976, the plaintiff class was defined as:

 " . . . those inmates who are or have ever been assigned and transferred to the Management Control Unit of the Trenton State Prison."

4. Additional defendants who were later added include Richard Seidl, Supervising Superintendent of the N.J. Prison complex; Lawrence Ashton, Corrections Lieutenant and Chief of MCU; Stan Samuelson, Director of Professional Services; E. Calvin Neubert, Asst. Superintendent, Trenton State Prison.

the MCU. The validity of these Standards is also before the Court.[5]

## I

### FINDINGS OF FACT

Trenton State Prison, (also to be referred to as TSP), is the only fully maximum security penal institution in the State of New Jersey and it also is the oldest. The original portion of the prison was built in the 1830's and its most modern segment, 7 wing, was built in the early 1900's. The prisoners assigned to Trenton State are generally those serving a maximum sentence in excess of twenty years, and/or those who present difficult management problems from within the entire state prison system. Because of overcrowded conditions at TSP, as many as 1300 inmates in April of 1974, a conscious policy to reduce the population was followed by prison officials. This was to be accomplished by moving the less serious offenders to other institutions in the State. These offenders included those inmates who did not present disciplinary problems and those who had lower security classifications. At the same time, TSP was the receiving institution for the difficult management cases which were found to exist in other institutions. In short, TSP has the majority of the maximum security and problem inmates from the entire prison system.

On October 16, 1975 a major confrontation took place within the prison between two rival Muslim groups, which left the acting minister of one group dead and several inmates critically injured. The battle took place in the prison school area, a place which had heretofore been considered safe since it was air-conditioned and the offices of most inmate organizations were located there.[6] Prison officials responded by locking all TSP inmates in their cells twenty-four hours a day while a prison-wide search was made and calm was restored. This general "lock-up" lasted until the second week in November, making it one of the longest prison-wide lock-ups in memory. Also during this time: The inmate offices were moved to a more secure location; the private telephones utilized by several organizations, a source of many problems long before the October 16th incident, were removed; and several inmates, mostly Muslims, were transferred to other institutions or placed in protective custody in the Vroom Building within the TSP complex.

Gradually normal operations returned in mid-November; however, the situation was far from stable. There was much anti-Muslim sentiment among the inmate population for the former's actions had had a severe impact upon the latter. There was also much anti-administration sentiment because of the continued curtailment of several inmate programs and privileges. An additional factor which contributed to the instability was the lack of leadership among the inmates themselves. It is no secret to anyone familiar with prison life that within an inmate population there are those who, either by their organizational position or by the force of their own personality, are able to exert a controlling influence over many other inmates. In the view of Warden Hoffman, because of the transfers which

---

5. The Management Control Unit is located in Trenton State Prison and is intended to be the only MCU in the State. The regulations before the Court involve the operation of this Unit only, thus no three-judge court is necessary to pass upon their validity. *Clutchette v. Procunier,* 497 F.2d 809 (9th Cir. 1974), rev'd. on other grounds, *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810, 1976; *Hatfield v. Bailleaux,* 290 F.2d 632 (9th Cir. 1961); see generally, *Bd. of Regents v. New Left Education Project,* 404 U.S. 541, 92 S.Ct. 652, 30 L.Ed.2d 697 (1972).

· In addition, as will be seen there is no substantial federal or constitutional question as to the validity of these regulations. Thus, even if they were viewed as having state-wide applicability, there would still be no need to convene a three-judge court. *Goosby v. Osser,* 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973).

6. As defendant Seidl put it:

"Up to October 16th, inmate organizations had telephones, volunteers were coming in regularly. It was probably in many respects one of the most liberally operated [maximum security] institutions in the entire country . . . ."
T. IX, p. 22.

had been made both to reduce the TSP population and after the October 16th incident, most of the former leaders were no longer present, and the roles had been filled by a greater number of less stable individuals.

By late November there had been numerous events which seemed to reveal the continued presence of tension, including an upsurge in disciplinary charges and letters requesting a transfer out of TSP. Defendant Hoffman testified that he had learned through informers of death threats against him and other prison officials. On the afternoon of December 2, 1975, approximately 200 inmates in the main exercise yard held an informal meeting which was called by the Prisoners' Representative Committee. This Committee is a recognized organization created at the request of the Governor. It was intended to serve as a representative liaison between the inmates and prison officials, but its activities, like those of all other prison groups, had been sharply curtailed since the October 16th incident. The meeting was apparently to discuss ways of demonstrating inmate concern and dissatisfaction with the continuing withdrawal of group activities at TSP. Members of various groups and sub-groups (both recognized and unrecognized) were, of course, present and a variety of approaches to the problem were suggested. The views ranged from violent to moderate and apparently included everything from a show of force to work slowdowns. The meeting ended peacefully and, so far as it appears, the inmates reached no decision on how to proceed.

From the standpoint of the administration, however, this yard meeting had far greater significance. Defendant Hoffman, who never viewed the activities in the yard first hand, was advised by guards that the meeting was taking place. He was also informed that some of the rhetoric among inmates in smaller groups was inflammatory—advocating a violent inmate response to administration policies. He stated that the meeting was a highly unusual occurrence at TSP, although it would seem not to be in view of the fact that the usual channels of group communication had been shut down. Hoffman's immediate response to the reports he was receiving was to display the strength of the administration by dispatching additional guards with automatic weapons in view to the guard towers surrounding the yard. No attempt was made to break up the meeting, however. Following the inmates' return to the main building, several events occurred which, in the view of the Warden, indicated that a true crisis might be developing. Many inmates returned from the yard with body guards close at hand. Others requested their wing-keeper to lock them in their cells because they "did not want to become involved". Inmate informers suggested that trouble was imminent and the guards' written reports suggested the same. Defendants Seidl and Fauver were called to the prison and a decision was made to run a "slow-mess" that evening. This involved feeding the inmates in shifts to avoid a large gathering in the mess hall.

As the evening progressed other events occurred which further indicated an unstable situation. Attendance at mess was unusually sparse, and attendance during wing television time was off. This latter fact was apparently most unusual since this time is highly valued by the inmates. In short, it appeared as if many inmates were afraid to come out of their cells. After the inmates were locked up for the night, the defendants agreed that there would be no regular opening in the morning. The prison was to remain under a general lock-up.

At a meeting that night of defendants Hoffman, Seidl, Fauver and others, the situation was assessed and it was concluded that there were a number of inmates in the general population who required much stricter security measures than were possible in the general flow of population. It was decided that a close custody type unit, where these inmates could be segregated and their movements more restricted, would be needed. Given the facilities at TSP, there was only one area felt suitable for such a unit, viz.,—7 wing. The wing officers of the prison were instructed to

draw a list of inmates in their respective wings who they felt needed closer custody. These were to include security risks who were disruptive, or possibly assaultive. Borderline cases were to be included pending further review. The defendants admit they used very rough criteria at this point. These lists were then examined by the defendants and other superior officers and several inmates' names were stricken because it was felt that the wing-keeper had erred. Some of the inmates on the lists were already housed in 7 wing [7] which had been a part of general population up until this time. Many other listed inmates had to be moved from other parts of the prison, often trading places with those prisoners ordered to vacate 7 wing.

The movement of those inmates listed began in the early morning hours of December 3, 1975. The inmate was told to gather as much of his personal belongings as he could and then was immediately escorted by three or four guards dressed in riot gear to 7 wing. When the initial transfer was completed twenty-five to thirty percent of the TSP inmates were located in 7 wing. At least seventy of the initial three hundred inmates in 7 wing were not on the transfer lists, but remained in what used to be their general population 7 wing cell until room could be made for them elsewhere. By December 5, 1975 the 7 wing unit, containing 230 inmates, the same number listed for transfer, was designated the Management Control Unit, (hereinafter referred to as MCU). Also on that date, the general lock-up of TSP was lifted and general population resumed a fairly normal schedule. From the administration's point of view, the crisis had passed—the worst was over.

Over the next few weeks the records of the MCU inmates were more thoroughly reviewed to determine whether any of the 230 were, upon further reflection, not in need of close custody. There is an apparent conflict in the testimony between defendants Hoffman and Seidl as to exactly how many inmates were transferred out of the Unit by this closer evaluation, estimates ranged from ten to one hundred. During this period, on or about December 10, 1975, the MCU inmates were given written notice that 7 wing had been designated the Management Control Unit; that a Special Classification Committee had been established and would soon begin hearings to determine which inmates should remain in the Unit; and that nine criteria (set forth in the notice) would be used to determine whether an MCU classification was warranted.[8] The members of the Special Classification Committee (hereinafter SCC) were appointed by the Warden. On December 31, 1975 inmates Louis Hodges and Earnest Pace brought this action pro se.

By January 19, 1976 approximately eighty inmates were designated by the SCC to remain in the MCU and each was given a review date. Also in the Unit at that time were approximately forty inmates whom the SCC had decided should return to the general population, but who had not as yet moved out because space had not become available. On the night of the 19th and the early morning hours of the 20th, TSP was again rocked by violence—this time not within the general population but within the MCU. Approximately a dozen to two dozen inmates in the Unit were involved in what was later discovered to be an escape attempt which left one inmate killed and a prison guard severely injured. Certain prisoners had somehow come into possession of guns, grenades and other weapons and when control of the Unit was restored, a complete search of 7 wing was undertaken by the New Jersey State Police.

It should be noted that the MCU inmates were forced to live under some rather rugged conditions during this time. They were transferred to the lower tiers of 7 wing and placed in empty cells in some

---

7. This was so because of the prison's internal classification procedures which attempted to place "troublesome" general population inmates in seven wing. Hoffman, Deposition p. 69.

8. See discussion *infra* in part II regarding these nine criteria and SCC hearings.

cases with no clothes, no mattresses and no running water in sink or toilet. The water had been turned off in 7 wing to avoid the flushing of contraband and to facilitate the police search of the plumbing system. Water was provided the inmates in buckets, although hot water was not provided for at least a week. The inmates were fed regularly. Within approximately one to three days of the incident, jump suits and other essential items were provided.[9]

Since January, the situation within the MCU has returned to normal and at last count there were approximately sixty inmates designated to remain in the Unit by the SCC. MCU inmates each occupy a single cell which is five feet by seven feet and approximately seven feet high. These cells have cold running water, toilet with flush control, interior controlled lighting and other items.[10] Inmates are confined in their cell twenty-four hours a day except for an exercise period which ranges from one to two hours almost every day. The exercise yard is the smallest at the prison, but has a basketball hoop and a chinning bar. Inmates may have their personal belongings in their cells including radios, television, record players, books, magazines, personal clothing—in short, all items which inmates in general population are permitted to have in their cells. Their meals are the same as those served in population, except they must eat in their cells. Inmate runners provide MCU inmates with requested law books or commissary items. Medical and psychiatric assistance is available upon request or when a guard feels it is necessary. Rehabilitative facilities and programs are virtually non-existent in the Unit with the exception of an education packet which enables inmates to do school work in their cells. This program is of little value to many of the MCU inmates because their current level of education is too high. Due to their MCU confinement, these inmates are unable to pursue or continue college level courses. There are areas on each tier of 7 wing—MCU where inmates could participate in group study, worship or recreation (i. e., T.V., cards, checkers, etc.), but these activities are not permitted nor are any planned. The only personal contact MCU inmates have with one another occurs during outdoor recreation periods. The inmates can communicate verbally with one another. MCU inmates have no contact, however, with prisoners in general population.

## II

### DUE PROCESS

There is no dispute over the fact that the plaintiffs in the instant matter were transferred to the MCU without prior notice and hearing. Assuming only for the purposes of the *prior* hearing issue that any notice and hearing were required at all for the instant transfers, see discussion *infra,* the Court is of the opinion that under the circumstances of this case such steps were not needed *before* the plaintiffs were transferred. The law is clear that when exigent circumstances within a prison warrant, an inmate may be subjected to more restrictive confinement without prior notice and hearing. *Gray v. Creamer,* 465 F.2d 179, 185 n. 6 (3d Cir. 1972); *U. S. ex rel Arzonica v. Scheipe,* 474 F.2d 720, 722 (3d Cir. 1973); *Hoitt v. Viteck,* 497 F.2d 598, 600 (1st Cir. 1974); *Morris v. Travisono,* 509 F.2d 1358, 1360 (1st Cir. 1975); *LaBatt v. Twomey,* 513 F.2d 641, 645 (7th Cir. 1975). That such exigent circumstances were in good faith apprehended here by defendant Hoffman seems clear, and this Court will not second guess the Warden's judgment on matters of internal prison security. *Hoitt, supra* at 600; *LaBatt, supra.* From the events which occurred at the prison in the latter months of 1975 and the information re-

---

**9.** See discussion *infra* part IV.

**10.** The cells also include a metal frame bed with a hinge which enables it to be placed against the cell wall, thus creating more space. A mattress, blanket, weekly linen, towels, soap, chair or stool, a desk and a footlocker are also in the cells. Inmates receive a shower every other day, and hot water in these cells at least once a day. They can have telephone/glass partition visits, but are not permitted personal contact visits.

ceived by the defendant on or before December 2, 1975, it is not difficult to understand why the Warden believed the situation to be:

". . . the worst I'd ever seen at the prison since I've been there in terms of the tension level and potential for violence. I thought we were a couple of steps away from having a very nasty scene."

T. III, p. 33. Due process did not require that he wait for violence to erupt before taking action.[11]

■ Apart from the *prior* hearing issue is the question of whether *any* hearing was necessary in the instant case under the Due Process Clause. After the conclusion of the Court's hearings on this matter, the United States Supreme Court handed down its decisions in *Meachum v. Fano,* —— U.S. ——, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) and *Montanye, Correctional Supt. v. Haymes,* —— U.S. ——, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), which cast considerable doubt upon the necessity for hearings in the context of the present case. The Court rejecting the notion

". . . that *any* grievous loss . . [or] . . . *any* change in the conditions of confinement having a substantial adverse impact on the prisoner involved is sufficient to invoke the protections of the Due Process Clause,"

*Meachum,* —— U.S. at p. ——, 96 S.Ct. at p. 2538, and finding that the state had not created any right in a prisoner to remain in a particular prison, held that no sufficient liberty interest was affected by the transfer of an inmate from one prison to another to trigger the protections of due process. This was so even though an inmate is placed ". . . in substantially more burdensome conditions [than] he had been experiencing," *Id.,* at ——, 96 S.Ct. at p. 2538, and regardless of ". . . whether or not [the transfers] are the result of the inmate's misbehavior or may be labeled as disciplinary or punitive." *Montanye,* —— U.S. at p. ——, 96 S.Ct. at p. 2547.

In a case significant in its factual similarity to the instant matter, *Carlo v. Gunter,* 392 F.Supp. 871 (D.Mass.1975), *vacated* 520 F.2d 1293 (1st Cir. 1975), the circuit court attached little significance to the fact that the "transfers" occurred within a single institution, *Id.,* at 1296, and, relying upon its earlier holding in *Fano v. Meachum,* 520 F.2d 374 (1st Cir. 1975), concluded that due process required a hearing where a transfer resulted in more stringent conditions of confinement. The subsequent reversal of *Meachum* suggests that *Carlo* and the instant plaintiffs have no right to a hearing at all.[12]

From the outset of the MCU, however, it was always the intention of prison officials

---

**11.** In addition there is little evidence to suggest that an emergency did not in fact exist. To be sure an emergency is not open-ended or unlimited in duration, and the duration of emergency conditions is not within the unreviewable discretion of the Warden, *Hoitt, supra* at 600, but there is no such problem here. Indeed, as will be seen, hearings were given the plaintiffs within a reasonable time after their confinement in MCU. In moving the listed inmates as he did without prior notice and hearing, the Warden probably avoided the confrontations which developed from similar circumstances in Massachusetts. See, *Carlo v. Gunter,* 392 F.Supp. 871, 874–876 (D.Mass.1975), vac. and rem. 520 F.2d 1293 (1st Cir. 1975).

**12.** It might well be argued that since the plaintiffs in *Carlo* were not placed in twenty-four hour lock-up conditions, but operated entirely within one wing of the prison, their situation differs significantly from that of the MCU in-

mates. Although the expectation of remaining at a particular prison or in a particular part of a prison unless found guilty of misconduct is "too ephemeral and insubstantial" an expectation to require due process protection, *Meachum,* —— U.S. at p. ——, 96 S.Ct. at p. 2540, it could be said that the New Jersey prison complex (like others), through its "policies and practices", *Perry v. Sindermann,* 408 U.S. 593, 603, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), has created a justifiable expectation that an inmate would not be placed in solitary confinement or conditions similar to it absent proof of misconduct or the occurrence of certain events. See, *Wolff v. McDonnell,* 418 U.S. 539, 571, n. 19, 94 S.Ct. 2963, 41 L.Ed.2d 935; see also, *Bruce v. Wade,* 537 F.2d 850, 854, n. 9 (5th Cir. 1976). The Court need not resolve the issue, however, as the defendants have and will continue to provide MCU inmates with hearings and periodic reviews.

to provide these inmates with some type of classification hearing. The defendants went even further after the first classification hearings were completed and provided each remaining MCU inmate a re-hearing in accordance with the standards set forth in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The objectives, criteria and procedures involved with these hearings were fully described in court and were later incorporated into written prison regulations. Div. of Correction and Parole, Standard 141.210 *et seq.* The Court takes judicial notice of these regulations.

Various prison classification and review committees, the prison's adjustment (disciplinary) committee, as well as the Superintendent, Deputy Keeper and the Director of Professional Services may all submit recommendations to the Special Classification that a particular inmate be reviewed for placement in MCU. If the SCC decides to conduct an inquiry into the recommendation, the inmate is given written notice of the SCC hearing at least twenty-four hours prior to appearing. This notice delineates the criteria which the SCC utilizes in its evaluation and also points out the major factors for consideration in that inmate's particular case. The inmate is advised that he may have the assistance of a counsel substitute, or he may speak on his own behalf. He may submit all the documentary evidence or statements he desires and may call witnesses as well, provided same would not prove unduly hazardous to institutional safety. After the hearing, the inmate is provided with written notice of the Committee's decision advising him of the reason for the decision and a summary of the evidence relied upon. If the decision is to place the inmate in the MCU, the Committee must inform him of the elements of his behavior or attitude which were deemed unsatisfactory and set a date for review of his case not later than ninety days from the date of last decision.

The criteria used by the SCC to determine whether to assign an inmate to MCU must, in sum, demonstrate that the inmate poses a real and substantial threat to the safety of others, or of damaging or destroying property, or of interrupting the operation of the institution if he were housed in general population. The SCC examines the inmate's disciplinary record, his past criminal record including the offense for which he was committed, prison records from past institutionalizations, his psychological make-up, any involvement in criminal activity while at the prison, his attitude toward authority, his institutional record on work assignments, his adjustment to institutional programs, his ability and willingness to house with other inmates, and informant and other staff reports. When reviewing an inmate assigned to MCU, the SCC reviews the information upon which it based its initial decision together with the records of the inmate's behavior and attitude while in the Unit.

From all of the foregoing, it is clear to this Court that under no circumstances could it be said that plaintiffs have suffered a denial of due process. Whether *Wolff* controls or *Meachum* controls, the plaintiffs' rights were not violated. Accordingly, plaintiffs' request for a permanent injunction is denied and judgment on this issue shall be entered for the defendants.

### III

### EQUAL PROTECTION

"The equal protection clause does not take away from the state the power to make classifications for a reasonable purpose which do not create invidious discrimination or invade some fundamental interest."

*LaBatt v. Twomey,* 513 F.2d 641, 649 (7th Cir. 1975). At the outset, this Court is satisfied that no invidious discrimination or invasion of any fundamental interest is discernable from the record in this case. See discussion *infra* at V. Thus, the inquiry for the Court centers on whether the steps taken in creating and operating the MCU, classifying inmates and withdrawing the opportunity of some inmates to participate in activities available to other inmates, were

for reasonable and legitimate state purposes. *McGinnis v. Royster,* 410 U.S. 263, 270, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973).

■ Regarding the very existence of the MCU, the state created the Unit for the purpose of segregating from general population those inmates determined to be a threat to others or themselves, a threat to property, or a threat to the normal operations of general population. This is clear from the written regulations, Div. of Corr. and Parole, Standard 141.210–212, and it is also clear from the testimony of prison officials. As defendant Seidl noted:

"... if some have to be locked up for the betterment of the general population, because the general population fears for their life, for their canteen, for their material goods, I believe that's a necessity in operating a prison such as TSP."

Vol. IX, p. 32. Defendant Hoffman also revealed:

"... that major difficulties in a prison setting very rarely come as a result of a concerted effort by a majority of the inmates, even in a place like Trenton. You have a distinguishing, although it is more sizeable, minority of people who are going to stir the pot all the time . .

\* \* \* \* \* \*

[T]he more aggressive verbal action oriented type individuals are usually the ones who dominate . . . You don't find them when you get in to a 'go-down' type of situation, unless they happen to be . . . trapped in it."

Hoffman, Dep. p. 97, 98. See also, Seidl, Vol. IX, p. 34. For the more orderly operation, safety and security of the general population and to reduce the overall tension levels in the prison, the MCU serves a rational, indeed, positive penological purpose. There is no equal protection violation incurred by the Unit's existence. See *Long v. Harris,* 332 F.Supp. 262, 270 (D.Kan.1971), aff'd. p. c. 473 F.2d 1387 (10th Cir. 1973).

There is also no equal protection violation engendered by the classification of inmates for MCU or the accompanying loss of rehabilitative and entertainment opportunities.

The classification or determination of which inmates should be segregated from general population is consistent with the overall purpose of the Unit, and, more importantly, is performed in accordance with procedures and criteria set forth in prison regulations. Indeed:

"[i]f in their [SCC] judgment, based upon their experience, expertise, and reliable information, they reasonably believe that individual prisoners or groups of prisoners are inciting or provoking violence or breach of prison [security and] discipline, it is their *duty* to segregate such inmates from the general prison population." (Emphasis added).

*Long, supra,* 332 F.Supp. at 270–271. As for the claims of particular inmates that were denied equal protection by the SCC assignment to MCU,

"... this Court . . . does not sit as a 'prison review agency'. \* \* \* [T]he scope of review is normally limited to deciding whether the [SCC] action taken was arbitrary, or punitive."

*Wesson v. Moore,* 365 F.Supp. 1262, 1266 (E.D.Va.1973). While this Court upon reviewing the individual records may have decided to segregate certain prisoners whom the SCC released and vice versa, (compare inmate T. Gibson with inmate L. Thomas), it cannot be said that any of the SCC decisions were arbitrary or punitive. See, *Id.,* n. 7 & 8. Nor is there a denial of equal protection because MCU inmates do not have the same rehabilitation and entertainment opportunities as other inmates. *Urbano v. McCorkle,* 334 F.Supp. 161, 171 (D.N.J.1971) aff'd. 481 F.2d 1400 (3d Cir. 1973); *Marnin v. Pinto,* 463 F.2d 583, 586 (3d Cir. 1972; *Beatham v. Manson,* 369 F.Supp. 783, 790 (D.Conn.1973).

■ The final equal protection problem presented involves the manner in which inmates were initially selected for MCU assignment on December 2, 1975. To be sure, defendant Hoffman could have continued to keep the entire prison locked up while a thorough examination was conducted of every TSP inmate's file. It is not the duty of

this Court, however, to judge with perfect hindsight what was the *best* way in which to handle the situation at the prison. The question is whether the steps taken were so unreasonable and irrational as to be violative of equal protection. The testimony reveals that the wing-keepers, perhaps more than any other set of officers at the prison, have the most continuous contact with the same group of inmates. It would hardly seem irrational to use them for the initial selection process. Indeed it appears to be quite reasonable. Certainly there was a risk of some rather irrational, vindictive, and arbitrary choices on the part of these officers, and the testimony reveals that a few such choices were probably made. It is important to note, however, that the lists compiled by the wing-keepers were reviewed by higher prison officials before transfers were implemented to guard against such choices. Moreover, it must be remembered that:

> ". . . the problems of government are practical ones and may justify, if they do not require, rough accommodations,—illogical, it may be, and unscientific. [Citation omitted]"

*McGinnis, supra* 410 U.S. at 270, 93 S.Ct. at 1059. See also, *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). On balance this Court is of the view that the plaintiffs' right to equal protection was not violated by the initial selection process utilized at the prison on December 2, 1975. The process may not have been the most desirable, but it was not unreasonable or irrational.

For the foregoing reasons, plaintiffs' request for a permanent injunction based upon a violation of equal protection is denied and judgment on this issue is granted to the defendants.

## IV

## CRUEL AND UNUSUAL PUNISHMENT

■ As was noted in the Court's findings of fact, the conditions under which the plaintiffs were forced to live following the January 19th escape attempt were rugged. The Court need not elaborate further, how-ever, for although the conditions were deplorable and would warrant court intervention in other circumstances, in view of the problems then existing, the conditions did not constitute cruel and unusual punishment. See, *Johnson v. Anderson,* 370 F.Supp. 1373, 1389 (D.Del.1974). See generally *Carlo v. Gunter, supra,* 392 F.Supp. at 878; *Ford v. Bd. of Managers of New Jersey State Prison,* 407 F.2d 937 (3d Cir. 1969). The prisoners lived in a truly deprived state for a relatively short time, and the record is devoid of any suggestion that the conditions were imposed intentionally. A clear emergency situation existed in 7 wing at this time and critical security measures were taken to insure safety and restore order. These measures included the need to examine mattresses with a metal detector, securing the crime scene and searching clothing, cells, etc. As was noted in a case involving a similar situation:

> "The delay was regrettable but was not shown to be purposeful. The overall circumstances suggest an administrative oversight [and a shortage of man-power] rather than a conscious attempt to degrade the plaintiffs."

*Johnson, supra* at 1389.

As to the present conditions in the MCU outlined in the findings of fact, the Court is not sailing in unchartered waters. The Supreme Court has indicated that the test is a cumulative one with no one factor controlling.

> "If a punishment is unusually severe, if there is a strong probability that it is inflicted arbitrarily, if it is substantially rejected by contemporary society, *and* if there is no reason to believe that it serves any penal purpose more effectively than some less severe punishment, then the continued infliction of that punishment violates the command of the [Eighth Amendment]." (Emphasis added).

*Furman v. Georgia,* 408 U.S. 238, 282, 92 S.Ct. 2726, 2748, 33 L.Ed.2d 346 (1972), Brennan, J., concurring. From the cases this Court has examined, the authority most often cited is *Sostre v. McGinnis,* 442 F.2d 178 (2d Cir. 1971), *cert. den. sub nom.,* 404

U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740. A factual review of the conditions of Sostre's confinement would serve no purpose; however, it can be safely said that they were not significantly different than the conditions currently existing within the MCU. In a careful examination of the precedents and plaintiff's conditions, the Second Circuit could not find that his confinement reached the level of cruel and unusual punishment. *Id.* at 191–193. Nor do subsequent cases suggest a different holding here. Even the court in *Spain v. Procunier,* 408 F.Supp. 534 (N.D.Calif.1976), which involved inmates who had spent in excess of four years in twenty-four hour lock-up conditions, did not declare the cumulative effects of such confinement to be cruel and unusual, but only ordered certain conditions and practices, not present in the instant case, to cease.

▪ That segregated confinement does not in itself constitute cruel and unusual punishment is beyond question. See *Sostre, supra* at 192 and the cases cited therein. While it would appear to this Court that prolonged confinement in a truly solitary situation (*i. e.,* no conversation or contact with others, no reading material, radio or television, complete sensory deprivation) would approach, if not surpass, the limits of permissible punishment, *cf. Craig v. Hocker,* 405 F.Supp. 656, 677 (D.Nev.1975), but see *Johnson, supra* at 1387, 1390, as would grossly unsanitary conditions, *cf., Wright v. McMann,* 387 F.2d 519, 521 (2d Cir. 1967), the plaintiffs' conditions of confinement here falls far short of this limit.

▪ Plaintiffs have also alleged a willful failure and refusal on the part of the defendants to provide adequate medical care for the MCU inmates. Such an allegation is not supported by the record in any way whatsoever. As far as it appears to this Court, the defendants have made every good faith effort to meet the medical needs of the plaintiffs. No Eighth Amendment violation can be found.

It should be noted, however, that the segregation scheme at TSP, particularly as set forth in its regulations, is somewhat duplicative and is open to some questions regarding the objectives sought by segregation. The objectives of MCU segregation with its twenty-four hour lock-up approach is to separate from general population

> ". . . [a] group . . . who have proven themselves to be capable of serious acts of individual or collective violence against persons, of destruction of property and disruption of [prison] programs. Such inmates may not personally be involved in unauthorized behavior at any given moment, thus assignment to Administrative Segregation . . . may be precluded. However because of their capability and marked propensity to periodically engage in injurious or disruptive behavior, this group demands a higher degree of scrutiny and control over their activities."

Div. of Corr. & Parole, Standard 141.210. From this policy, and of course the criteria discussed earlier, the SCC is to segregate an inmate in MCU if he is determined to be "a substantial threat to the safety of others"; or "a substantial threat to property"; or a substantial threat to the orderly operation of the institution. Standard 141.212. It is interesting to note, however, that the policies and objectives of Administrative Segregation are virtually identical to those of the MCU, except the "group" which is included in the former includes those who have committed specific acts of misconduct. The Adjustment Committee (disciplinary committee) may recommend Administrative Segregation as a disciplinary sanction against an inmate found to have committed a serious act of misconduct, Standard 254.-276, but such a recommendation must be reviewed by a classification committee. This latter committee may utilize "Ad. Seg.":

> ". . . where the inmate's presence in the general population poses a serious threat to life, property, himself, staff, other inmates or the security of the institution."

Standard 256.231. The inmate placed in "Ad. Seg." is not to be released until a separate review committee is satisfied that

he is no longer "a probable danger to the general safety and security of the institution." Standard 256.281.

The Court has no problem with the use of twenty-four hour lock-up segregation which seeks to confine one who has displayed specific and recurring violent, destructive behavior regardless of whether segregated in MCU or "Ad. Seg.". Nor does the Court have any quarrel whatsoever with a prison policy which segregates from general population those inmates who, while not themselves violent or destructive, disrupt the orderly and peaceful operation of the prison by "stirring the pot", controlling others, organizing resistance movements and spurring confrontations. This appears to be a major purpose behind the MCU. What the Court cannot understand is the apparent necessity to keep these latter inmates under twenty-four hour lock-up conditions. The threat which these inmates presented to the institution existed only when they were permitted to circulate in general population. By being separated and placed in 7 wing, this threat has been removed and absent an objective indication that the inmate is also violent, there would appear to be no need for twenty-four hour lock-up confinement. This is all the more so in view of the fact that 7 wing has the facilities to permit these MCU inmates to function out of their cells in secure conditions.

 However, the Court's own views on how the MCU should be run and how other prison policies and programs should be carried out are not relevant, for it cannot

" . . . *as a federal court* . . . command state officials to shun a policy that they have decided is suitable because to us the choice may seem unsound or *personally* repugnant." (Emphasis original).

*Sostre, supra* at 191. Unless the actions of prison officials give rise to deprivations of a Constitutional magnitude, the federal courts cannot and will not intervene. This Court finds no such deprivations here. Accordingly, plaintiffs' request for a permanent injunction is denied and judgment on

this issue shall be entered for the defendants.

## V

## FIRST AMENDMENT

The plaintiffs have asserted that their rights under the First Amendment have been violated in two particulars. First, that their right to freedom of speech has been infringed in that they were punished—sent to the MCU—for expressing their views on administration policies. Second, that their right to free exercise of their religion is infringed because they are unable to attend group religious services while housed in the MCU.

 To be sure, the protections of the First Amendment were not taken from the plaintiffs when they entered prison and the Court will guard their rights when unconstitutionally impaired. *Sostre, supra* at 189 and the cases cited therein. For instance, an inmate does have the right to be free of discriminatory punishment which is imposed solely because of his beliefs. *Gray v. Creamer,* 465 F.2d 179, 186 (3d Cir. 1972).

"To sanction such punishment, even though in the judgment of prison officials the [speech is] 'inflammatory' and 'racist,' . . . would permit prison authorities to manipulate and crush thoughts under the guise of regulation. The intimidating threat of future similar punishment would chill a wide range of prisoner expression . . . ."

*Sostre, supra* at 202. The Court, of course, recognizes that these rights are not absolute and speech may be regulated in time, place and manner. *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). In addition not all speech is protected speech. *Chaplensky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). See also, *Newkirk v. Butler,* 364 F.Supp. 497, 501 (S.D.N.Y.1973), mod. on other grounds 499 F.2d 1214 (2d Cir. 1974), vacated and rem. on other grounds 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975) regarding clear and present danger.

As for the instant case, the Court is sensitive to the fact that with a unit such as MCU there is an increased risk that it may be used as an instrument to stifle or punish disfavored but nevertheless protected speech. The Court cautions the defendants that discriminatory punishment, (*i. e.* placement in MCU), for the proper exercise of an inmate's First Amendment rights will not be tolerated. The allegations of infringement of these rights in the instant matter, however, are not supported by the record. Plaintiffs argue that many of those attending and speaking at the meeting in the yard were later sent to the MCU. Plaintiffs also admit, however, that many inmates who did not attend or speak were also placed in the Unit. In short, there is no evidence of a concerted effort to punish those speaking in the yard. Nor did the "show of force" by prison officials infringe upon the inmates' rights, as no attempt was made to break up the yard meeting. While prison officials may not have personally favored the political views of certain inmates, or agreed with their criticism of administration, the record does not support the view that any actions were taken against the plaintiffs for their expression.

■■■ As for plaintiffs' claim regarding their right to group religious services, the law is clear that while the freedom to believe is absolute, the exercise of religion is not. See, *Sharp v. Sigler,* 408 F.2d 966, 970 (8th Cir. 1969). At the same time, however, restrictions on the plaintiffs' exercise of their religion must be " . . . . reasonably and substantially justified by considerations of prison discipline and order". *Sweet v. South Carolina Dept. of Corrections,* 529 F.2d 854, 863 (4th Cir. 1975). In short, they must be " . . . reasonably necessary to promote a 'compelling state interest'." *Lipp v. Procunier,* 395 F.Supp. 871, 877 (N.D.Calif.1975).[13] See also, *Sherbert v. Verner,* 374 U.S. 398, 406, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

"The orderly administration of the penal laws of a given state, which necessarily includes an orderly administration of prison population and control of hazards and dangers to inmates and property is of itself indisputably a compelling state interest of that state. [Citation omitted]." *Lipp, supra* at 877. However:

"[w]hether the proclivities, habits or inclinations of an individual or group of prison inmates to act present a clear and present danger to prison discipline and control of prison safety to persons and property is a question of fact . . . ."

*Id.* See also, *O'Malley v. Brierley,* 477 F.2d 785 (3d Cir. 1973).

■■■ It is not disputed that the defendants do not permit MCU inmates to participate in group religious services. They provide for individual spiritual counseling by ministers when requested and arranged through the prison chaplain. Standard 141.285. Whether there is a compelling state interest for denying the plaintiffs congregated religious services does not appear from the record. Neither the plaintiffs nor the defendants presented testimony on this specific issue. As was noted earlier in Part IV of this opinion, there may be some question regarding the need to keep certain MCU designates confined under twenty-four hour lock-up conditions. The Court will have to consider the extent to which a clear and present danger would be presented by these inmates if they congregated for religious services in the Unit. The Court would also have to consider the existence of such a danger if other MCU inmates were permitted to so congregate in view of the security precautions and facilities within the Unit. It may well be that security as well as other factors will necessitate a finding that under the circumstances the plaintiffs' rights are not being violated by the defendants' policies. See, *Sweet, supra* at 863, 864. On this record, however, the Court cannot resolve the issue. Accordingly, decision on plaintiffs' request for a permanent injunction on this issue is reserved, and defendants' motion for summary judgment on this issue is denied pending further hearings if same are necessary.

13. Reported settled at 402 F.Supp. 623 (N.D. Calif.1975).

## VI

## DAMAGES

In their amended complaint, plaintiffs seek monetary damages for the alleged constitutional deprivations inflicted upon them by the defendants. With one exception which has yet to be resolved, the Court has found no violation of the plaintiffs' constitutional rights, nor does the record reveal any other basis for the recovery of monetary damages. Moreover, while not absolutely immune from personal liability, prison officials do have a qualified immunity from liability as to acts performed within the scope of their official duties. *Knell v. Bensinger,* 522 F.2d 720, 723 (7th Cir. 1975). The record discloses no evidence of subjective bad faith, or that any defendant acted with such disregard for the plaintiffs' clearly established constitutional rights that his actions could be fairly characterized as being in bad faith. *Id.,* at 725. See also, *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). Accordingly, plaintiffs' claim for monetary damages is denied.

## CONCLUSION

For all of the foregoing reasons, plaintiffs' request for a permanent injunction is denied as to all claims, except that based upon the free exercise of religion. Plaintiffs' request for monetary damages is denied as to all claims. Judgment for the defendants shall be entered on all claims except that based upon the free exercise of religion. The Court will retain jurisdiction as to the latter issue.

Defendants shall submit an order.