**FOUR UNNAMED PLAINTIFFS**

v.

**Frank HALL and Frederick Butterworth.**

**No. CA 76–4322–T.**

United States District Court,
D. Massachusetts.

Dec. 9, 1976.

**358**

Michael C. Donahue, Asst. Atty. Gen., Lee Bromberg, Dept. of Corrections, Boston, Mass., Marylou MacGregor, Dept. of Corrections, Boston, Mass., for defendants.

Richard J. Vita, Thomas C. Troy, Troy & Vita, Dorchester, Mass., Angelo P. Catanzaro, Alan P. Caplan, Martin K. Leppo, Boston, Mass., for plaintiffs.

## MEMORANDUM

TAURO, District Judge.

This is an action brought under 42 U.S.C. § 1983 by four anonymous inmates at M.C.I. Walpole arising out of their transfer from the general population cell blocks to segregated cells within that facility.[1] They allege that the transfer violated rights guaranteed to them by the Due Process Clause, the Equal Protection Clause and the constitutional prohibition against cruel and unusual punishment, all applied to the states through the 14th Amendment.[2] The de-

---

1. This action was originally filed by four unnamed inmates. At the hearing, the court allowed a motion to intervene by five other unnamed inmates as plaintiffs.

2. At oral argument on this motion, only the due process claim was pressed. It is therefore the

fendants are the Commissioner of the Massachusetts Department of Corrections and the Superintendent of M.C.I. Walpole.

This matter came on before the court on plaintiffs' motion for a temporary restraining order to require the return of the plaintiffs to general population cells and to forbid their confinement in segregated cells absent prior procedural safeguards. This court denies the request to release the inmates from segregation. Defendants are, however, ordered to give plaintiffs detailed notice of the charges pending against them and to provide a reclassification hearing on those charges, within a reasonable period.

## I.

According to an uncontradicted affidavit submitted by one of the plaintiffs,[3] he was awakened in the early morning hours of December 3, 1976, in his general population cell block, A–2, and taken from Walpole to M.C.I. Bridgewater. After several hours at that facility, but still on December 3rd, plaintiff was moved back to Walpole. Upon his return, he was placed not in his A–2 cell, but in a segregated unit in Block B–10. The plaintiff asserts that he is subject to severe deprivations accompanying this transfer: confinement to his cell for 23 and one half hours per day, reduction of visitation privileges, denial of social, work and education privileges, and exposure to health hazards resulting from the unsanitary conditions in B–10.[4] It is uncontradicted that plaintiffs have never been informed as to the charges, if any, pending against them, and have never been granted a hearing as to the validity of those charges.[5]

## II.

■ In addressing questions of prisoners' due process rights, this court is mindful of two fundamental yet conflicting concerns. On the one hand, inmates do not forfeit all of their civil liberties as a result of their incarceration. As Justice White noted in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), "There is no iron curtain drawn between the Constitution and the prisons of this country." 418 U.S. at 555–56, 94 S.Ct. at 2974. At the same time, federal courts have fostered a "hands-off" policy toward the administration of state correctional facilities. *Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). It is with cognizance of these competing concerns that this court acts today.

The seminal case in the area of prisoners' due process rights is *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). In that case, inmates challenged the process by which they were denied "good-time credits." While noting that prisoners do not have any independent right to good-time, the Court held that Nebraska inmates had a liberty interest in such credits because they were specifically provided for by Nebraska statute. Once classified as a liberty interest, good-time credits could only be diminished in accordance with the Due Process Clause. The Court engaged in a balancing of institutional and individual interests in determining what process was ultimately due.

■ In companion cases last spring, *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) and *Montanye v.*

focus of the court's attention at this stage of the litigation.

3. It is assumed that the experiences described by the affiant are representative of those of all the plaintiffs.

4. Counsel disagreed as to whether confinement to B–10 constitutes segregation or isolation. State law draws a distinction. See Mass.Gen. Laws ch. 127, §§ 39, 40. For the moment, the court assumes that plaintiffs are being held in segregation, since the plaintiffs so plead.

5. At oral argument, it was suggested to the court that plaintiffs' change in status was related to charges stemming from a recent rash of killings at Walpole. Without delving into the details of the situation at that institution, the court is satisfied that action was taken against these plaintiffs in response to an administratively perceived emergency threatening the peace at Walpole and the safety of its inmates.

*Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), the Court elucidated the due process standard suggested in *Wolff.* Both cases involved § 1983 challenges to inmate interprison transfers and both held that no due process safeguards attached to such transfers because the inmates had no liberty interest in remaining in a particular institution. In determining the lack of a liberty interest, the Court stated in *Montanye,*

> We held in *Meachum v. Fano,* that no Due Process Clause liberty interest of a duly convicted prison inmate is infringed when he is transferred from one prison to another within the State, whether with or without a hearing, *absent some right or justifiable expectation rooted in state law that he will not be transferred except for misbehavior or upon the occurrence of other specified events.* (emphasis added).

427 U.S. at 242, 96 S.Ct. at 2547, 49 L.Ed. 2d at 471.

It is the existence of a right or justifiable expectation rooted in state law which determines the existence of a liberty interest and dictates when due process safeguards attach to prisoners' claims. This court, therefore, must focus its attention on whether such a right or expectation exists.

### III.

Defendants contend that plaintiffs have no liberty interest affected by their transfer from Block A–2 to Block B–10. The court rejects that contention because plaintiffs have a reasonable expectation, rooted in state law, that they will not be moved from general population cells to segregated cells absent particular conditions and specified procedures. Those circumstances and procedures are set forth in Massachusetts statutes and State Department of Corrections Regulations.

■ Mass.Gen.Laws ch. 127, § 39 grants the Commissioner of Corrections the discretion to order the segregation of any inmate "whose continued retention in the general institution population is detrimental to the program of the institution." The statute provides, however, that the segregated prisoner must enjoy a certain quality of confinement including regular meals, furnished cells, visitation, recreation and communication privileges. There is no doubt that this statute creates a reasonable expectation of such rights in Massachusetts inmates. Thus an inmate cannot be confined in segregation under lesser conditions, absent due process procedures. The defendants represented to the court, at oral argument, that the plaintiffs are being segregated in compliance with § 39 mandated conditions. The court will accept that representation, until contrary evidence is received.

■ More important to this case, Massachusetts Department of Corrections regulations create a reasonable expectation that no inmate shall be placed into segregation, even in an emergency, unless the institution has commenced, or is about to commence procedures leading up to a hearing on the reason for the inmate's segregation. The hearing is a mandatory step in the Department's procedure for changing an inmate's classification, that is the terms and conditions of his confinement. Those regulations are the Department of Corrections, D.O. 4400.2, Guidelines for Operation of the Reclassification Process—Intrafacility and Interfacility, conceded by all parties to apply to the instant situation.

The relevant procedure is set out in § 4.2a, which is entitled "[p]rocedure when transfer to a higher custody status is being considered." That section specifies a sequence of events which must be followed in order to change an inmate's classification. The first step in that procedure is affording notice of the reasons for the hearing and of the charges being leveled (§ 4.2a(1)). The second step is the provision of a hearing, three days after the notice, subject to certain requirements set out in parts 6–10. During the course of the § 4.2a procedure, from giving of notice until reclassification is complete, § 4.2a(a) allows interim emergency segregation of the inmate where it is necessary to preserve institutional peace. Where the Deputy Commissioner for Classification and Treatment or the Superintendent or his designee determines

*at any time prior to or during this proceeding that there is an immediate threat to the health and safety of the resident or to others, the resident may be placed in an awaiting action status until there is a final decision about a transfer.* (emphasis added).

§ 4.2a(2)

The term "proceeding" apparently refers to the reclassification hearing itself.

█ Defendants argue that § 4.2a(2) empowers them to segregate the plaintiffs before any of the § 4.2a procedures have commenced. While great weight should be afforded to the Department's interpretation of its own regulations, see *Bellotti v. Baird,* 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844, 853 (1976), the court believes there is a stronger construction of § 4.2a(2) to be derived from its regulatory context. In context, that section seems to provide an emergency remedy available only during an ongoing reclassification procedure which has commenced by notice. Furthermore, the practical consequences of adopting defendants' argument are troublesome. It would authorize plaintiffs' indefinite segregation without telling the inmates when they would be afforded their right to notice and a hearing.

Even if one were to concede that § 4.2a(2) permits the Commissioner, in an emergency situation, to segregate an inmate without a prior notice, such a reading does not compel the acceptance of the defendants' position nor does it leave the plaintiffs without a remedy. In order to avoid reading § 4.2a(2) so as to abrogate all the rights extended by the regulatory reclassification procedure, however, the court finds a requirement implicit in that section that notice and a hearing be given within a reasonable period after the emergency segregation is accomplished. Without that inference, § 4.2a(2) is transformed into a license for the Department to hold an inmate in segregation indefinitely, without ever providing notice or a hearing. Under this alternative theory, the plaintiffs may have been legitimately segregated in light of the perceived emergency at Walpole. Notice and a hearing must now be provided within a reasonable period. The court rules it unreasonable to make the inmates wait more than one week. Because they have already been segregated for six days, they must be given notice by December 10, and a hearing a week later.

Defendants alternatively argue that Department regulations do not create a reasonable expectation rooted in state law, within the meaning of *Wolff* and its progeny. Defendants claim that *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) stands for the broad proposition that state regulations never create substantive rights protected by the Due Process Clause. That is both an overstatement and oversimplification of the holding in *Bishop.* This court holds, under the circumstances of this case, that Massachusetts corrections regulations do create the kind of expectations which give rise to liberties protected by due process under *Montanye* and related cases. If inmates cannot rely on the Department's own regulations, what purpose do the regulations serve?

█ In so holding, the court finds that *Bishop* is not controlling here. In that case, the plaintiff claimed a property interest, protected by due process, in an expectation of municipal employment derived from a local ordinance. The Court did not hold that such an expectation could never create an interest protected by due process. Instead, the Court looked to the state court construction of the ordinance. Finding none, the Court fell back on the interpretation given by the federal district judge, which it characterized as "tenable." At the same time, it was recognized that a contrary holding was suggested by six members of the Supreme Court in *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), when interpreting the scope of the property interest conferred by federal regulations. 426 U.S. at 345, 96 S.Ct. at 2078, 48 L.Ed.2d at 690, n. 8. Here there is no state construction of these correction regulations. In light of that void, the import of *Arnett,* and the narrow holding of *Bishop,* this court is free to interpret

the scope of these regulations. It holds that they do create a liberty interest in the plaintiffs—certainly a tenable interpretation.

■ The defendants argue further that the First Circuit opinion in *Hoitt v. Vitek,* 497 F.2d 598 (1st Cir. 1974), indicates that plaintiffs need not be afforded due process here. That case, however, dealt with the wholesale lock-up of ninety percent of a prison's population. The court agrees that Walpole officials probably could put the whole prison population in lock-up, for a reasonable period, in response to an emergency. But they didn't. Instead, a handful of inmates have been singled out for severe deprivations. *Hoitt* does not authorize such action.

■ Finally, it has been suggested that federal court intervention in this situation is inappropriate out of a concern for comity. Defendants, as well as the Norfolk County District Attorney, assert that any relief granted to plaintiffs by this court will interfere with on-going state administrative and criminal investigations. Defendants refer to the equitable abstention doctrine, evolving from *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), by which a federal court should not interfere with an on-going state criminal proceeding. The court does not interpret that doctrine to require federal courts to avoid interference with state criminal or administrative proceedings in the *pre-indictment* stage, as is the case here. *See, Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1973). Furthermore, the state and county could give no assurance as to when their investigations would be complete. They were thus requesting a stay of potentially unlimited duration. The court declines to extend such relief.

## IV.

The court, therefore, holds that plaintiffs have several reasonable expectations rooted in state law, relating to their emergency transfer to segregated facilities. First, they are entitled to a certain quality of confinement. Second, they should receive notice and a hearing contemporaneous to the segregation or within a reasonable period thereafter. The court will protect those liberty interests with the provisions of the Due Process Clause. Plaintiffs shall remain in segregated facilities under the conditions specified in Mass.Gen.Laws ch. 127, § 39. The defendants shall, however, provide plaintiffs with a detailed notice of the charges pending against them, as contemplated by applicable regulations, by 5 p. m. Friday, December 10, 1976. Hearings on those charges shall commence no later than 10 a. m. on the following Friday, December 17, 1976. The defendants shall remain free to amend the notice of charges to reflect developments in their on-going investigations. If the defendants exercise their right to amend, the plaintiffs shall be allowed to request continuances of the hearing to enable them to respond fully to the charges. An order has issued.

## APPENDIX

Department of Correction, Commonwealth of Massachusetts, D.O. 4400.2, *Guidelines for the Operation of the Reclassification Process—Intrafacility and Interfacility*

## PROCEDURES IN RECLASSIFICATION

4.1 *Preparation for the meeting*—When an individual is to be reclassified, members of the committee are notified by the Director of Treatment or case manager of the purpose of the review and the date the case will be considered by the committee. It is then the duty of each staff member to prepare material to be included in the progress report which shall summarize any significant new information and a statement of the individual's progress since the last classification report.

4.2 *Procedures for Reclassification Meetings*

4.2a *Procedure when transfer to a higher custody status is being considered*

4.2a(1) The department shall give the resident written notice at least three working days in advance of

a meeting of a Departmental Classification Committee. This notice shall contain a description of the board and its powers, the procedures to be followed at the meeting, the reason for the meeting, and a listing of the time and place for the meeting. A copy of this notice shall be sent to the Deputy Commissioner for Classification and Treatment, the Superintendent, the case work section, the resident, and, upon his request, his representative. The form of notice to be used by the Department is attached.

4.2a(2) Where the Deputy Commissioner for Classification and Treatment or the Superintendent or his designee determines at any time prior to or during this proceeding that there is an immediate threat to the health or safety of the resident or to others, the resident may be placed in an awaiting action status until there is a final decision about a transfer.

4.2(3) The resident shall attend all board meetings where his transfer is being considered. If he refused to, except as stated in section 4.2a(6) attend a meeting, the board shall meet and make recommendations.

4.2a(4) A case worker or case manager and where requested by the resident, his representative shall assist him and shall attend all meetings where his transfer is being considered except as stated in section 4.2a(6).

4.2a(5) Prior to a meeting, the resident shall be given an opportunity to discuss with a case manager and his representative all matters which may be relevant to his case. The case manager shall make available to the resident or the resident's representative those portions of his correctional facility file that may be disclosed.

In accordance with the provisions of G.L. Chapter 6 Section 175 (Criminal Offender Record Information System) the resident shall be allowed to access (sic) to factual criminal record information as defined by the regulations of the Criminal History Systems Board (CHSB). The disclosure of evaluative data shall be in accordance with DOC regulations.

4.2a(6) The chairperson, at his discretion, may permit the resident or his representative to tape record the proceedings. Such tape recordings shall be left at the facility after the hearing and shall remain in the custody of the department. The resident or his representative shall have access to such tapes or reasonable notice to the Department. The Department may have a representative present at the time of such access. Information that the board determines to be confidential shall not be tape recorded.

4.2a(7) If during a meeting, a witness or staff member wishes to present oral or written informant information he shall state to the Board that he wishes to present such information to the Board without the resident or his representative being present. The Board shall then direct the inmate and his representative to leave the meeting while the informant information is presented to the Board. The Board shall also inquire into the reliability of the informant. It shall not be necessary for the Board to interview the informant in person. It may rely on oral or written hearsay testimony. After reviewing the testimony, the Board shall make a determination as to the informant's reliability and the reliability of the information. The Board shall also make a determi-

nation as to the extent to which the resident may be informed of the nature of the information presented. The Board shall not hear informant information which has previously been presented to a disciplinary board. In such cases the Board shall limit its inquiry to the results of the disciplinary proceeding.

4.2a(8) If, during a meeting a witness or staff member wishes to present oral or written information other than informant information which he considers to be confidential, such as a psychiatric report, he shall state to the Board that he wishes to present such information to the Board without the resident or his representative being present. The chairperson shall then direct the resident and his representative to leave the meeting while the information is presented to the Board. In such cases the board shall hear the information without the resident or his representative being present and shall decide whether hearing the information with presence of the resident is likely to cause a severe emotion responses (sic) detrimental to his mental health. Unless this finding is made the information shall be presented in the presence of the resident and his representative. If the information is presented without the resident or his representative present the Board will decide the extent to which he can be informed of the information.

4.2a(9) At the meeting, a resident may testify and present written statements of other witnesses. The Board may call any person before it to speak or it may request any person to present written information. The resident may re-

quest the Board at its discretion to hear witnesses who wish to testify in his behalf.

4.2a(10) Upon completion of discussions of all relevant information with a resident, the board shall take the matter under advisement.