Leonard JEFFERSON et al.

v.

Bradford E. SOUTHWORTH et al.

Civ. A. No. 77–554.

United States District Court,
D. Rhode Island.

Feb. 3, 1978.

Matthew L. Myers, National Prison Project of ACLU, Washington, D. C., Robert B. Mann, Providence, R. I., for plaintiffs.

John E. Farley, Providence, R. I., for State of R. I.

Paul L. Foster, Dept. of Corrections, for the State of R. I., Cranston, R. I., for defendants.

## MEMORANDUM OPINION AND ORDER

### In Re Lockup[1]

PETTINE, Chief Judge.

This is a class action challenging the constitutionality of a lockup at the Maximum

---

1. Though this was a combined hearing on a report from the Master appointed in *Palmigiano v. Garrahy, infra,* and on a lockup existing at the ACI, this Opinion will address only the lockup issue.

Security facility of the Adult Correctional Institution (ACI), brought pursuant to 42 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202. Jurisdiction is conferred by 28 U.S.C. § 1343(3).[2]

The defendants, in the absence of an existing emergency, have locked the prisoners in their cells for approximately 22 hours a day; and although there has been a modification of this confinement, over fifty percent are still so confined on the day of this writing. Such isolation has exacerbated the uncontradicted, indeed admitted, inhumane living conditions set forth in *Palmigiano v. Garrahy,* 443 F.Supp. 956 (D.R.I. 1977) (*Palmigiano*). Even more devastating, the isolation has undermined the inmates' emotional capacity to cope with those inhumane conditions by depriving them of the aid, emotional support and social context, which they derived from contact with other inmates, their families and attorneys. This confinement has resulted in increased tensions, depression and a sense of hopelessness in the inmates. The deleterious effects, alone and in conjunction with the inhumane conditions existing before the lockup, are of such magnitude as to constitute a clear violation of the Eighth Amendment's proscription against cruel and unusual punishment.

### I. The Facts of This Case

This Court entered judgment in *Palmigiano,* on August 10, 1977, that conditions at the ACI violated the Eighth Amendment and issued its remedial decree. The State of Rhode Island admitted to the Court's findings of fact; it did not appeal from the finding of a violation or the remedial decree. The Court's uncontradicted findings, confirmed also by various nationally respected prison experts, were that conditions at the ACI were inhumane, intolerable and brutish.

On August 26, 1977, within 16 days of the issuance of the *Palmigiano* opinion, Director of Corrections, Bradford Southworth, ordered a general lockup at the Maximum Security facility (Maximum). This brought an abrupt halt to all activities for all of the inmates, numbering over four hundred, although only a couple were involved in the incident that the administration claimed constituted good cause for the lockup. There was a cessation of all vocational, educational and hobby programs; deprivation of visits and exercise; restricted access to attorneys who had to visit their clients at the cell doors and speak to them between bars. All meals were served in the prisoners' cells.

The incident on August 25 setting off the lockup involved only two prisoners and a guard. When the inmates were ordered to return to their cells, there was no refusal or resistance, whatsoever. The prisoners were told that they would be returned to their normal routine the next morning. However, without first-hand knowledge of conditions in Maximum and against the advice of their own warden of Maximum, Ronald Brule, the defendants determined to continue the lockup thereafter. As late as November, the Director of Corrections, Bradford Southworth, was indicating that he would continue the lockup "indefinitely," perhaps a year.

The defendants claim that, although a fight triggered the lockup, that incident cannot be viewed in isolation. Prior thereto, there had been a series of inmate assaults upon each other, a gun was discovered, and contraband flowed into the prison. Defendants maintain that this general situation threatened the security of Maximum and required the total confinement of the prisoners. The inconsistency of the State's position is apparent. None of these acts had received any particular administrative reaction prior to August 26. Nor was there

---

**2.** There being no objection, pursuant to Local Rule 12(a)(2), the following motions of the plaintiffs have been granted: Motion to Amend Complaint (11/2/77); Motion for Certifying Class (11/2/77); Motion to Add Party Plaintiffs (11/2/77).

evidence that at the time the lockup was ordered, any of these prior acts were discussed or determinative of the ultimate action taken.

Following the initial complete lockup, defendants have urged and implemented a slow process of phasing out the lockup in stages. The first phase began, on September 6, 1977, with visits permitted once every four days.

On October 21, 1977, defendants instituted Phase II. A two hour visit every four days was allowed. Exercise for one hour a week was permitted, but this coincided with the every other day shower so that inmates had to choose, once a week, between a shower and exercise. Visits with attorneys continued to take place at the inmate's cell, with bars in between. In Phase II, only 45 of the over 400 inmates were permitted to attend an education, arts and crafts program 4½ hours a week for three weeks of each month and 6½ hours for the fourth week of the month. It follows that close to four hundred prisoners were spending 23 hours a day locked in their cells, and that the few others, who attended classes, averaged 22 hours a day in total confinement. This confinement, coupled with the cold, noise and filth, created a bitter atmosphere and intolerable conditions for the inmates.

To complete the picture, it must be noted that there were periods when all prisoners were denied all privileges: from August 26—September 5, 1977 and from October 22 to November 3, all visits were denied; from October 24 to November 3, all exercise was also denied. It is clear the defendants have been routinely using the deprivation of these basic human activities as punishment. Smaller groups of prisoners have been routinely denied these activities periodically.

Defendants next justify the extension of this lockup with only a very slow and minimal decrease in confinement by reference to inmate disobedience during the lockup. The defendants state that

> [S]ince the onset of the general lockup, inmates have engaged in a variety of acts which were intended to disrupt, diminish or destroy the efforts of the administra-

tion to return the maximum facility to some degree of normalcy. Specifically, inmates . . . refused to clean their cell block areas even when ordered to do so and that they refused to participate in programs designed to allow them time from out of their cells . . . only when they refused orders to clean their cell areas were they booked and suffered a loss of visiting privileges and exercise privileges.

Defendants' Post-Trial Memorandum, at 2.

The attitude that Director Southworth and Associate Director Laurie displayed in their testimony was that all signs of overt disobedience and wilfulness must be crushed before they would consider any letup in the lockup. It is true that since August 26 some of the inmates have refused to work when ordered out of their cells to clean the tiers and have thrown food outside their cells. These actions, however, were in protest to what the inmates felt was unfair, unjust treatment. The Court does not condone prisoner disobedience nor does the Court evaluate the inmates' conduct as it may have been prompted by the emotional effect of the lockup. One thing is certain, such disobedience was not of any emergency magnitude that would justify a lockup. One of the most drastic and disruptive measures a prison can take is a total lockup. To use this weapon for the disobedience at bar is a classic example of "overkill."

Indeed, the lawlessness and violence in Maximum, which emerges from the testimony, appears to be as much caused by the actions or inactions of the administration as by the prisoners. The defendants' concern over halting contraband within the institution should start with the guards and employees. Ronald Brule, Associate Director of Maximum at the time of his testimony, stated that he could not say that, since the lockup, there were fewer incidents of inmates being booked for intoxication or drug usage than during the period prior to August 26. The inescapable conclusion from the fact that prisoners obtain drugs and liquor, although locked in their cells 22

hours a day under the supervision of guards, is that the guards themselves are *pari delicto*. Mr. Brule also testified that either correctional officers or employees destroyed prisoner property during the lockup. Prior to August 26, certain inmates had property in an industrial building. Although no inmate since August 26 had access to this building without a guard, many of the inmates' "files were ripped into and desks overturned." According to Mr. Brule, however, his repeated efforts to discipline guards for these kind of problems were undermined by Messrs. Southworth's and Laurie's refusal to suspend guards.

Captain Costa, a correctional officer, corroborated the destruction of inmate property. In addition, he stated that in a room formerly used by the Afro-American Society, the word "niggers" was written on pictures they had hanging on the walls. The following colloquy took place with the Court:

COURT: I understand your testimony that at this time, the lockup was in effect, and no prisoner could possibly have gotten—watch my words now—could possibly have gotten into these areas without a guard?

WITNESS: Yes sir, that's true.

COURT: You know the conclusion from that, don't you, Mr. Costa? No prisoner could have been in there alone to do these things; that a guard would have had—have been a party and part and parcel of it.

WITNESS: No inmates were permitted in that area unsupervised, yes.

COURT: So it leaves one or two conclusions, and I wonder if you realize these conclusions: either a guard and an inmate had to do it or the guards had to do it themselves.

WITNESS: Yes, I realize that.

The defendants Southworth and Laurie have attempted to solve their problem of poor administration and poor control over the prison guards and inmates by locking up the inmates. They have been unable to come forward with any plans, demonstrating initiative, to end the lockup. Indeed, as has been noted, as late as November Mr. Southworth said he contemplated an indefinite lockup, extending for over a year. But Mr. Southworth's administrative solutions impose intolerable burdens on the prisoners.

At a November 14, 1977 hearing on the lockup, then in its third month, testimony established the deleterious effects of the lockup on inmates. Dr. Augustus F. Kinzel, an eminent psychiatrist, professor and author who visited the prison,[3] testified that, "the effect of the total actions, being locked up, being alienated from correctional offi-

---

**3.** Dr. Kinzel's background is impressive. He received an M.D. from the University of Pennsylvania in 1962. He completed his internship in medicine at Boston City Hospital and his psychiatric residency at the New York Psychiatric Institute and at Columbia Presbyterian Hospital, where he was a Chief Resident in 1966. From 1966–68 he was Staff Psychiatrist at the United States Medical Center for Federal Prisoners in Springfield, Missouri, with the United States Public Health Service in the Bureau of Prisons. From 1968–69, he was a Career Teacher Award grantee from NIMH, during which time he taught courses on psychiatry, psychoanalysis and law at Columbia Law School and on psychotherapy at Columbia Medical School where he teaches currently. From 1969–70, he was Attending Psychiatrist at the Washington Heights Community Psychiatric Service. From 1970 to the present, he has been in the private practice of general psychiatry, psychoanalysis and forensic psychiatry. He is certified by the American Board of Psy-

chiatry and Neurology and is a certified psychoanalyst and is a member of the American Academy of Psychiatry and of Law. He has published in the area of violent behavior and the determinants of violent behavior in inmates. He has visited a variety of prisons and testified in several prison "conditions" suits. Defendants do not attack Dr. Kinzel's expert credentials. They do argue that his testimony lacks "a firm substantial basis in fact" because he only talked to inmates for three-quarters of an hour and knew nothing of their individual medical records. However, in light of Dr. Kinzel's long prison experience, in light of the fact that he relied upon a professional colleague, the prison psychiatrist (who was hired by the defendants), for certain of the data upon which his expert testimony was based, and in light of the corroboration which other professionals, see pp. 184–185, infra, who work in the prison day-in-and-day-out gave to his observations, this Court gives great weight to his expert testimony.

cers who are locking up . . . constitutes a kind of assault on the individuals (with a commensurate sense of demoralization) . . . a kind of arbitrary attack." Dr. Kinzel's testimony portrays a macabre ambience created by a prison administration bent on demanding total control of and subservience from the prison population, an attitude which is slowly eating into the personalities of the prisoners. Dr. Kinzel testified that the result of this will be "a general withdrawal of interest [by the prisoners] in everything: people locked up long enough . . . begin to start to vegetate, and they begin to lose interest in their lives in general. . . ." As a direct effect of the lockup he found: a high percentage of the inmates received tranquillizers; there was an increase of physical complaints such as stiffness, diffused pains and aches, medically termed hypochondriasis, that is, "a feeling . . . the body is beginning to fall apart;" day-night reversal, the normal "rhythm of feeling sleepy at night and going to sleep and feeling refreshed and awake in the morning . . had essentially broken down" due to restricted visitation; hypersensitivity to noise—a noise level which, "was such [one] . . . could not hear conversation at a normal level—a constant din;" such distress occurred in one prisoner that he had made repeated suicidal gestures by cutting himself; general withdrawal of interest; headaches and eye problems because of the poor lighting in the cells; and a lack of relationship between guards and inmates. Dr. Kinzel reacted, too, to the physical environment: to the "cold temperature level," corroborated by another witness as being 49 degrees, and to the "filth and trash" in the prisoners' cell area where they were required to live.

The administration, as has been indicated, has taken refuge behind prisoner refusal to obey orders and their retaliation by fouling the area outside their cells with strewn food. The prisoners say such conduct was a protest to what they see as unjust treatment. Dr. Kinzel testified in answer to a request by the Court to explain such behavior:

I can say that based on my experience working in prisons and based on observations yesterday that I did not see any adamant intent to buck or be at loggerheads with the prison administration. There was really a pleading on the part of several of the inmates for simple just and fair administration, several of them very clearly stated they wished to cooperate. There was not, I did not get the sense that they felt they were at war in a major way with any of the guard group or the administration group. My impression is that the universal experience in prisons is if there is fair and just administration that this is what is most keenly appreciated by the inmates and correctional officers and the like. I don't know any other way to, I wouldn't be able to recommend any other way to handle it.

He concluded that, even under the best conditions, prisoners need strong control to avert disruption. But this is not to be equated to the kind of program defendants have instituted that is directed toward total suppression of behavior rather than a reinstitution of policies and activities that would generate a trusting environment with genuine security.

Apart from Dr. Kinzel's testimony, there is, on this record, the assessment of individuals intimately acquainted with the prison.

Francis Foley is an eighteen year veteran of the corrections administration; he has served as classification counsellor for ten years and deputy warden for eight years. With a few exceptions, he has been in Maximum every day since the lockup began. He testified that he is "fearful for the end of the lockup" and sees "the inmates reaching the end of the line as far as any hope is concerned;" in some cases inmates are losing touch with reality, deteriorating in their ability to communicate socially. He says they fear losing control of themselves.

Mr. Thomas Ware, a sculptor in the arts and corrections program, told the Court that his classes were suspended with the lockup. He was allowed to instruct the men in their cells and as a consequence

visited Maximum on a regular basis. Three of the eight men he was teaching lost their ability to communicate with him; he saw one break up his television, mumbling, "They [the administration] took my art work. They took my art work. Why don't they just kill me." On another occasion he saw a prisoner whose hands were so cold he was shaking. The inmate had a window open and preferred suffering the extreme cold rather than enduring the stench pervading the cell area. Even with the windows open, Mr. Ware said the stench was "bad."

Associate Chaplain Andrade testified that some inmates feel they are losing their minds and that he has seen progressive mental deterioration. To the same effect was the testimony of another witness, Sister Mary Grace. She states, "I am aware that Phase III is said to have started. Its impact, if any, is minimal. It appears to have done little to alleviate the debilitating effect of the lockup, the continuation of which exacerbates adverse conditions at the ACI."

Father Maher, head of the Catholic Chaplaincy team at the Adult Correctional Institution told the Court that, during the first week of January, he spoke with approximately 350 men. He states, "For the vast majority of men . . . the lockup has not even begun to end . . . Phase III has not reduced the continuing strain of the lockup for the overwhelming majority of the population."

In addition, the prison psychiatrist has stated that there exists a dangerous situation and that steps must be taken to end this lockup. He stated that there are growing "feelings of anger and hostility on the side of the inmates as well as the guards" which are going to increase if the lockup continues.

Finally, there were introduced as evidence, without objection, a number of affidavits from prisoners attesting to much of what has been stated herein.

On January 11, 1978, just as this Court was about to go forward with its opinion, defendants submitted another memorandum stating that on December 28, 1977, they had instituted Phase III of the lockup. They claim "beyond doubt that the lockup . . . . has been in all regards lifted." In capsule form, the defendants now contend:

1. [T]he classification board has met and assigned inmates to various activities in accordance with their institutional history and indicated preferences.

2. Defendants [have] moved inmates with similar interest to adjoining cell areas within the facility to allow for expeditious use of time and security personnel.

3. Individual schedules [have been] prepared for these groupings such that, dependent upon the status of the inmate, they might spend in excess of eight (8) hours per day out of their cells (employed inmates) or as little as three (3) hours for those inmates who are unemployed and not desiring to participate in the educational program.

4. [A]ll inmates in the maximum facility are served three hot meals per day, two of which are served in the dining room; that all inmates are offered one hour and fifteen minutes of exercise per day out of their cells. [This is now in existence and is undisputed].

5. [A]ll inmates are afforded at least one weekday visitation period per week and at least two weekend visitation periods each month. All visitation periods are planned in advance. [These four periods per month are now in existence and are undisputed though plaintiffs seek an expansion of these rights].

6. [T]hat the lockup ended on December 28, 1977, and that any such conditions existing within the maximum facility since that date have occurred because of Plaintiffs' misconduct. [This is disputed].

7. [T]hat inmates continue to refuse to clean their cell area.

8. [T]hat since December 28, 1977, at least two inmates have been assaulted and beaten by other inmates for following the schedules as established by Defendants.

9. [T]hat on or before January 15, 1978, they will submit to the governor a re-

quest for funds to establish and enlarge the industries program to provide additional work opportunities for inmates within this facility. [This date has not been met].

10. [T]hat by January 30, 1978, additional recreation programs will be established within the cell block area.

11. Defendants have established schedules for all inmates and are complying with the schedules except when prevented from doing so because of inmate misconduct.

In an attempt to learn precisely and expeditiously what conditions presently exist at Maximum, upon receipt of the defendants' memorandum, the Court asked for a report from the Master, who was appointed to oversee the implementation of the *Palmigiano* Order. He submitted his report, a copy of which was forwarded to all counsel. A further hearing on the lockup and the Master's Report was scheduled. All parties were ordered to be prepared to present any and all evidence in support of their respective positions and in rebuttal of any factual findings and opinions contained in the Master's Report. The defendants were specifically ordered to support, with detailed facts and figures, the position they took in their memorandum of January 11, 1978 which contained matters outside the record and in which they claimed that the lockup was a moot question.

At this hearing, Associate Director Laurie testified that of the approximately 428 men in Maximum, 70 spend 8 hours a day out of their cells; 70 spend 5 to 6 hours a day out of their cells; 230 spend 3 to 3½ hours a day out of their cells; 38 in the Behavioral Correctional Unit spend 1 hour out of their cells; and 20 are in the hospital. Time out of cells includes meals, showers, exercise and visits.[4]

Significantly Mr. Laurie also testified that there is no existing emergency. Rather, he finds it necessary to keep the lockup in effect in order to have "a manageable operation at the institution." However, he does plan to employ "as many more inmates as possible as soon as he can bring in additional industries. This entails additional personnel and equipment and elements that have to be explored."

It is significant to note that, in the January 11, 1978 memorandum to the Court, the defendants stated that such a plan would be finalized and submitted to the Governor by January 15. Yet on the date of the hearing, January 27, Mr. Laurie admitted that no plans had been finalized and no cost projections had been made. He said that, at best, it would take approximately six months before anything could materialize. When asked if there were any alternatives which could be employed during this interim period to occupy the 230 men still in complete confinement, he answered, "None at all." He did not explain why no consideration was given to reactivating programs that had existed prior to the lockup. In other words, there is no evidence on the record that any range of alternatives were ever explored.

Mr. Southworth, the Director, added very little more. He stated that plans have been made to employ 130 more inmates in expanded industries, but even under optimum conditions nothing could be started before four months.

This merely repeats what has happened in each prior hearing on the lockup. The administration asserts that the lockup must be ended in a planned and orderly way, and that they intend in the indefinite future to institute just such an orderly end. But

---

4. Plaintiffs introduced into evidence records of attendance at these various educational, arts and vocational programs. Mr. Laurie admitted under cross-examination that such records would be more accurate than his testimony which was based on memory and his impressions. These data show that Mr. Laurie's figures are exaggerated and that a much lower number of inmates have been attending these programs. The schedules in evidence also demonstrate that a lower number of hours is actually spent outside cells than Mr. Laurie estimated, because of scheduling conflicts which compel prisoners to choose between showers and recreation or an educational program. For convenience, this Court uses Mr. Laurie's figures, which still show over half the prison in a severe lockup.

whenever they are pressed, they admit to having no definite plans which they can present to end the lockup and no deadlines by which they can be counted on to have a final plan.

The Court recognizes that some progress has been made. But it also must be recognized that the defendants have failed to present a meaningful plan to return to a constitutionally acceptable pattern of living for the inmates. Mr. Southworth himself stated the future is indefinite.

## II. Conclusions of Law

■ The Court cannot permit the defendants to continue to inflict unconstitutional hardships on the great majority of inmates because they, the defendants, are incapable of remedying the conditions they rely upon to justify their actions. The prisoners cannot be made to suffer unconstitutional deprivations because of the lack of management capability found in the Department of Corrections.

■ In this case, the undue period of isolation absent an emergency would be enough to declare the lockup unconstitutional because it is arbitrary and because it is a disproportionate punishment for the August 26 incident. Moreover, the isolation, by itself and also as intensified by the terrible and unconstitutional conditions, see Palmigiano, supra, under which the prisoners must live, is having such deleterious effects on the inmates' minds and bodies as to be cruel and inhumane and offensive to our society's evolving sense of decency. See Nadeau v. Helgemoe, 561 F.2d 411, 413 (1st Cir. 1977).

■ To be free of cruel and unusual punishment is the retained right of every inmate. The inhumane living conditions at Maximum still exist for all the prisoners. The incredible idleness this Court documented in Palmigiano continues but now the prisoners are caged in their idleness. Worst of all, the lockup imposes a new element of human isolation, deprivation from human activity and interaction.[5] In deciding the constitutionality of the lockup, this Court cannot ignore the exacerbating effect the foul and inhumane conditions found in Palmigiano[6] must have upon the

5. In Nadeau v. Helgemoe, 561 F.2d 411 (1st Cir. 1977), the First Circuit reviewed the conditions of confinement for prisoners in protective custody. These prisoners voluntarily subjected themselves to conditions more restrictive than those in the rest of the prison. They ate in their cells, could only shower five times every two weeks, had outdoor recreation and access to the canteen twice a week, could visit the library once a week, and significantly had two hours of tier-time five days a week during which period they could visit with other prisoners. From 3:30 p. m. until the following morning prisoners were locked up, except where visits or medical calls took them out, and through the general prison population. While the court stressed the danger of these trips into general population, surely such trips also provided contact with others and a generally orienting experience to the more normally functioning prison community, which surrounded their more limited confinement. Id. at 412–13. The prisoners chose their isolation and their isolation was based on reasonable grounds, their own safety. By contrast in the present case, the confinement is without reason, arbitrary and punitive; moreover, the end of the lockup is beyond the inmates' own influence. Second, in Nadeau prisoners in protective custody had some contact with the normally and appropriately functioning larger prison community; they were not so cut off and isolated. Finally the prisoners in protective custody had two hours of tier-time during which they could fraternize and roam a bit. This contrasts significantly with the case at hand. For at the ACI, all chances for real, daily human contact are minimal. The recently instituted communal meals have helped only minimally since they are conducted at break-neck speed: 20 minutes is allotted for prisoners to leave their cells, go to the dining room, pick up their food, eat it, throw away their styrofoam trays and return to their cells.
Cf. Jones v. Wittenberg, reported in 11 Clearinghouse Review, Nat'l Clearinghouse for Legal Services, at 824–25 (1978) (preservation of order within a well managed jail did not require limiting visits and prohibiting contact visits to pre-trial detainees; such prohibition would be a punishment); 440 F.Supp. 60, 153–58, 161–64 (N.D.Ohio 1977) (Master's Report).

6. The findings this Court made of the living conditions at Maximum in Palmigiano, supra, and which the defendants admitted were accurate as have all others who have visited this institution, are that: the conditions are inconsistent with all evolving standards of decency, "unfit for human habitation," "shocking to the conscience," and an "environment where debilitation is inevitable." These are undisputed

inmates who are isolated in their cells. *See O'Brien v. Moriarty*, 489 F.2d 941, 944 (1st Cir. 1973); *Murphy v. Wheaton*, 381 F.Supp. 1252 (N.D.Ill.1974).

The definition of cruel and unusual punishment is found in decisional law as applied to the fact pattern of the particular case at issue. Professor Sheldon Krantz in his book *Corrections and Prisoners' Rights*, at 161, summarizes these tests as follows:

> the primary test is whether under all the circumstances the punishment in question is ". . . of such character or consequences as to shock general conscience or be intolerable in fundamental fairness." *Lee v. Tahash*, 352 F.2d 970 (8th Cir. 1965). Underlying the Eighth Amendment prohibition is the basic concept of "the dignity of man." *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). The Court added in *Trop* that "the Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."
>
> Two further tests have also been utilized; (1) a punishment may be cruel and unusual if greatly disproportionate to the offense for which it has been imposed (*See e. g., Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910); and, (2) a punishment may be cruel and unusual when although applied in pursuit of a legitimate penal aim, it goes far beyond what is necessary to achieve that aim; that is, when a punishment is unnecessarily cruel in view of the purpose for which it is used. *Weems v. United States, supra.*

It is obvious that even these tests, however, provide limited guidance to courts in applying the Eighth Amendment prohibition against "cruel and unusual punishment."

. . . But many of the conditions of prison life would appear to violate the imprecise tests described above—particularly in light of "our evolving standards

of decency that mark the progress of a maturing society."

*See Nadeau v. Helgemoe*, 561 F.2d at 413–16.

■■■ As the Court stated in *Palmigiano*, it is not interested "in operating the Adult Correctional Institution in Rhode Island. It is not equipped for the task. Yet it has the duty to remedy the massive and serious constitutional violations established by plaintiffs." 443 F.Supp. at 985. Only two weeks after the *Palmigiano* opinion, the lockup in question was instituted and has continued in modified form for five months. The lockup causes a deprivation of prisoners' rights which, when measured against "the evolving standards of decency that mark the progress of a maturing society," *Trop v. Dulles*, 356 U.S. 86 at 101, 78 S.Ct. at 598, are unconstitutional. The Court must consider in deciding the constitutional question not only the length of the confinement but also the nature and genuineness of the alleged emergency, the nature of the confinement itself, its physical and emotional effect on the prisoners, and the need for the imposition of such punishment. In this case the lockup at issue fails on all counts and runs afoul of every definition of cruel and unusual punishment pronounced in the various decisions of our courts.

■■ During an emergency, prison officials may temporarily deprive prisoners of their due process rights. In *David v. Travisono*, C.A.No. 5280, Slip Op. at 3 (D.R.I. 1975), this Court stated:

> At the outset let me point out that no permission of the Court is necessary before prison authorities may temporarily deprive inmates of these due process rights during a period of emergency. *Morris v. Travisono*, 509 F.2d 1358, 1360 (1st Cir. 1975). As the First Circuit has noted in *Hoitt v. Vitek*, 497 F.2d 598, 600 (1974), "[E]mergencies, however, cease to be emergencies when they continue indefinitely and inmates cannot be kept confined to their cells indefinitely in alleged

facts and it is in this setting that these men are required to be alone in their cells. This isolation has been imposed not only on convicted

felons but as well on about 100 pre-trial detainees.

violation of their constitutional rights merely on the assertion of the warden that prison security requires it. The unreviewable discretion of prison authorities in what they deem to be an emergency is not open-ended or time unlimited. In this case there is not even an open question as to whether an emergency exists. Associate Director Laurie flatly states there is none. Even if an emergency once existed sufficient to justify the initial lockup, a conclusion this Court has not and need not reach, those circumstances ceased long ago and cannot justify confinement extending for over five months. Any deference, properly accorded an administrative determination that an emergency situation justifies a general lockup, is not appropriate when, by the administration's own admission, the emergency no longer exists. *See Hoitt v. Vitek*, 497 F.2d 598, 600 (1st Cir. 1974).

Thus the case at bar is clearly distinguishable from those lockups which were constitutionally justified because an emergency in fact existed, *see e. g., Hodges v. Klein*, 421 F.Supp. 1224, 1235–36 (D.N.J. 1976); *Blair v. Finkbeiner*, 402 F.Supp. 1092, 1094–95 (N.D.Ill.1975); *Knuckles v. Prasse*, 302 F.Supp. 1036 (E.D.Pa.1969), *cert. denied*, 403 U.S. 936, 91 S.Ct. 2262, 29 L.Ed.2d 717 (1971); *cf. LaBatt v. Twomey*, 513 F.2d 641 (7th Cir. 1975); *Carlo v. Gunter*, 392 F.Supp. 871 (D.Mass.1975), *vacated and remanded*, 520 F.2d 1293 (1st Cir. 1975) (due process required). The lockup at the ACI, affecting the general population, is also different in kind from the administrative use of segregation to punish specific misconduct of individual or several prisoners; those decisions that have found the latter form of confinement constitutional are inapposite to the case at bar. *See, e. g., Sostre v. McGinnis*, 442 F.2d 178 (2d Cir. 1971) (en banc), *cert. denied*, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972). *Cf. O'Brien v. Moriarty, supra; Four Unnamed Plaintiffs v. Hall*, 424 F.Supp. 357, 362 (D.Mass.1976), *reversed on other grounds*, 550 F.2d 1291 (1st Cir. 1977).

Because there is no emergency, the lockup can only be viewed as a disproportionate and arbitrary, and thus unconstitutional, reaction to the situation. This same conclusion was reached by an Illinois court with respect to a lockup of 16 months duration triggered by a general work stoppage in *Adams v. Carlson*, 368 F.Supp. 1050 (E.D.Ill. 1973), *on remand ordered in* 488 F.2d 618 (7th Cir. 1973). *See Sinclair v. Henderson*, 331 F.Supp. 1123 (E.D.La.1971); *Murphy v. Wheaton*, 381 F.Supp. 1252 (N.D.Ill.1974); *Hardwick v. Ault*, C.A. No. 74–139, etc., 447 F.Supp. 116 at 125–127, 131 (M.D.Ga. 1978). The extended duration of the lockup at the ACI belies any justification based on an emergency and magnifies the disproportionate nature of the administration's response. Thus, the lockup is significantly different in degree from the purely temporary confinements sustained by other courts. *E. g., LaBatt v. Twomey, supra; Hodges v. Klein, supra.*

Not only is the lockup not justified by an emergency, it has accomplished no useful purpose at all and cannot be justified in its present severe form by any purpose whatsoever. It is arbitrary. *See Feeley v. Sampson*, 570 F.2d 364 at 371 (1st Cir. 1978). On the contrary, it has produced a deterioration of the mood and basic social capacity of the inmates. The lockup has engendered disorders the inmates did not have before; medically, Dr. Kinzel [7] termed this "iatrogenic illness." Rehabilitation may be an illusive and rarely accomplished goal but at a minimum our penal institutions must not contribute to the grievous deterioration of the men placed in custody. *See Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Dr. Kinzel testified that the lockup caused tension, depression and hopelessness in the inmates to the point where they suffer hypochondriasis, attempt suicide, experience day-night reversal, develop hypersensitivity to noise because of the environment in which they are

---

7. The First Circuit has placed special emphasis on the role of medical testimony in establishing the cruel and abusive aspects of lack of exer-

cise and isolation. *Nadeau v. Helgemoe*, 561 F.2d 411, 420 (describing district court finding on health matters as "a very important one").

confined, withdrawal of interest, headaches and eye problems. It is, indeed, in this Court's opinion, inhumane treatment in the form of physical and psychological cruelty. The psychological impact of this oppressive caging of men in a dungeon-like atmosphere for over five months, in an attempt to subjugate the will of the inmates to the governance and discipline of the administration, is intolerable. Such "deliberate indifference to serious medical needs of prisoners" is cruel and unusual punishment, *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976); *see Nadeau v. Helgemoe*, 561 F.2d at 420.

The present tension that has been particularly acute during the lockup cannot be blamed solely on the disobedience of the prisoners but must be primarily laid at the administration's doorstep. Conceding the inmates' disobedience, that fact alone does not justify a continued pattern of grinding authority, the ceaseless exercise of which will completely break these men. It matters not they may be rapists, burglars, arsonists and murderers. Their aberrational conduct in open society mandated incarceration; but if there is any meaning to the Eighth Amendment and the humanity of the Constitution itself, no concerns of federalism can counsel a federal court to condone such absolute authority in the officials of any one of our fifty states.

Such drastic measures as a general lockup cannot be employed merely to compensate for defendants' mismanagement.[8] Only the most compelling temporary penal needs can, if ever, justify victimizing an inmate by thrusting upon him punishment otherwise prohibited by the Eighth Amendment. The defendants' responsibility to eliminate the unconstitutional burdens suffered by inmates cannot be measured by nor be dependent on their managerial capabilities. *See, Feeley v. Sampson, supra*, at 371; *Morgan v. McDonough*, 540 F.2d 527 (1st Cir. 1976), *cert. denied*, 429 U.S. 1042, 97 S.Ct. 743, 50 L.Ed.2d 755 (1977); *Milliken v. Bradley*, 433 U.S. 267, 295, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (Powell, J., concurring).

This Court feels constrained to reiterate that these defendants have

consciously disregarded a grave and substantial risk to the health and well-being of the inmates entrusted to their care, in the form of the needless occurrence, prolongation, or exacerbation of serious injury, illness or suffering . . . [and that] there is a complete absence of effective leadership or management capability on the part [of these defendants]. *Palmigiano*, 443 F.Supp. at 973, 977.

. . . the present management of the ACI is basically incapable of creating a safe, orderly, and hygenic prison to ac-

---

**8.** Judicial review of the capacity of administrators to operate an institution involved in a constitutional violation is appropriate. Administrative incapacity cannot justify the deprivation of civil rights. Thus, the First Circuit has stated, "Restrictions upon detainees that serve no proper purpose, but merely reflect the lack of imagination or energy of local officials, are properly the subject of judicial correction . . . ." *Feeley v. Sampson*, 570 F.2d at 371 (1st Cir. 1978); *see, Morgan v. McDonough*, 540 F.2d 527 (1st Cir. 1976), *cert. denied*, 429 U.S. 1042, 97 S.Ct. 743, 50 L.Ed.2d 755 (1977), and 548 F.2d 28 (1st Cir. 1977) ("The district court could not shut its eyes to what was taking place" (i. e. the "active and passive conduct [of school officials which] contributed to the grave situation so clearly at odds with the court's prior decrees", 540 F.2d at 532). Recently Justice Powell has noted that administrative failure requires federal court intervention when constitutional rights are at stake:

Moreover, the District Court was faced with a school district in exceptional disarray. It found the structure of the Detroit school system "chaotic and incapable of effective administration." . . . The "general superintendent has little direct authority." . . . Referring again to the "political paralysis" and "inefficient bureaucracy" of the system, the court also noted—discouragingly—that the election then approaching "may well [result in] a board of education consisting of members possessing no experience in education." . . . In this quite remarkable situation, it is perhaps not surprising that the District Court virtually assumed the role of school superintendent and school board. *Milliken v. Bradley*, 433 U.S. 267, 296, 97 S.Ct. 2749, 2765, 53 L.Ed.2d 745 (1977) (footnote omitted) (Powell, J., concurring).

complish the state's twin goals of custody and, where possible, rehabilitation. *Id.* at 978.

It must be concluded and I find that:

An unconstitutional lockup still exists at the ACI;

A state of emergency does not exist at the ACI;

 The defendants have arbitrarily and unnecessarily confined the majority of the inmates to their cells alone for between 21 and 22 hours a day under conditions, the totality of which violates the Eighth Amendment and Fourteenth Amendment of the Constitution of the United States.

### III. *Remedy*

A realistic approach to remedying the unconstitutional continuation of the lockup is called for. An instant release of the inmates only to roam the corridors without purpose or supervision is not a safe or constructive alternative. In this conclusion, the Court has given due deference to the administration's concern for order and safety in the institution. *See Feeley v. Sampson, supra,* at 371; *O'Brien v. Moriarity,* 489 F.2d at 944. The threat of violence engendered by inmate idleness has been documented in *Palmigiano* and led this Court to order defendants to institute programs and activities which diminish that idleness. If adequate programs to occupy the time inmates spend outside the cells were immediately available, a complete end to the lockup might indeed be proper. However, the testimony before this Court indicated that, as recently as January 26, 1978, these programs are not in place; indeed, the deadline of May 10, 1978 established in *Palmigiano* for full implementation of these programs is months away. As unfortunate as the present reality may be, it nonetheless counsels this Court to refrain from ordering defendants to release inmates for a fixed number of hours in the absence of meaningful, supervised activities.

 At the same time, the deleterious effects on the health of the inmates caused by the continuing isolation in their cells, in violation of the Eighth Amendment, must be ended. An orderly increase in contacts between inmates and their visitors, attorneys and counsellors, and among inmates themselves is both a feasible and safe interim remedy for the constitutional violations this Court found in Parts I and II of this Opinion.

The Court therefore takes the quite narrow step of ordering defendants to submit a plan within five days that will contain specific timetables and arrangements for the following:

1. Three meals per day in the dining room;

2. Visiting at the frequency permitted before the lockup began on August 26, 1977;

3. Consultation with counsellors in a private area other than the cell block if desired by the inmate;

4. Showers every other day;

5. Recreation for at least one hour per day;

6. Schools, industries, vocational training and work assignments for all sentenced inmates, who wish to participate and who are not confined to the Behavioral Control Unit, to the maximum extent currently available and to the maximum extent these programs become available in the future.

The schedules for these activities should minimize the overlap of different activities to maximize the amount of time an inmate can spend outside his cell. Defendants should prepare for implementation of the plan within fourteen days of its approval by this Court.

 This Order is not intended to contravene present or future disciplinary actions of individual prisoners, including denial of privileges, that are preceded by the proper procedures outlined in *Morris v. Travisono,* 310 F.Supp. 857 (D.R.I.1970). To the extent that these procedures have not been followed during the lockup, immediate reinstitution of these rules is required. Since any emergency that may or may not have existed initially no longer exists, con-

tinued suspension of the *Morris* rules is unjustified. *Morris v. Travisono*, 509 F.2d 1358 (1st Cir. 1975).

 The Court contemplates that implementation of this Order will not require undue additional funding or staff. In addition, by limiting time outside the cell to supervised activity, the safety of both the inmate and guard population is protected. Lastly, the devastating isolation of inmates that has continued for over five months, with dire consequences for both the psychological and physical health of the inmates, will be diminished. The Court's remedy will at least address the specific harms Dr. Kinzel described. Withdrawal of interest, for example, will abate as inmates mingle with one another at meals and in exercise periods and as inmates reestablish regular contact with the outside world in visitation periods. Inmates' psychological health can only improve with increased confidential help from counsellors. A sense of physical well-being is likely to replace the present atrophy through increased exercise and showers. Whether or not inmates have a constitutional right to a minimum number of showers or hours of exercise, *cf. Feeley v. Sampson, supra,* (pretrial detainees), nevertheless this Court, in its exercise of equitable discretion, *Swann v. Charlotte-Mecklenburg,* 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), can order such activities as a limited remedy for an unconstitutional lockup when a complete unlocking cannot be ordered because of the administration's failure to provide general supervision.

This Order and the plan and prison routine implemented pursuant to it constitute an interim remedy. Once the educational, training and employment programs are generally available, in satisfaction of the order issued in *Palmigiano*, so that inmates can spend considerable time outside their cells participating in these programs, re-evaluation of the frequency of some of the activities provided for in this Order may be appropriate.

At least for the present time, inmates who are currently participating in programs will be entitled to the same schedule of showers, exercise, visitation, etcetera as all inmates have. This Court is not convinced by any of defendants' evidence that the current participation in programs is extensive. Moreover, it is both administratively unworkable and unreasonable to require individual inmates to choose between a shower and an education. Obviously, the two types of outside activities are not fungible.